# PUBLIC CITIZEN v. UNITED STATES DEPARTMENT OF JUSTICE ET AL.

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

No. 88–429.   Argued April 17, 1989—Decided June 21, 1989*

---

*Together with No. 88–494, *Washington Legal Foundation* v. *United States Department of Justice et al.*, also on appeal from the same court.

*Eric R. Glitzenstein* argued the cause for appellant in No. 88–429. With him on the briefs were *Patti A. Goldman* and *Alan B. Morrison*. *Paul D. Kamenar* argued the cause for appellant in No. 88–494. With him on the briefs was *Daniel J. Popeo*.

*Deputy Solicitor General Shapiro* argued the cause for appellees in both cases. With him on the brief were *Acting Solicitor General Wallace, Assistant Attorney General Bolton, Paul J. Larkin, Jr.*, and *Douglas Letter*. *Rex E. Lee, Ronald S. Flagg, Carter G. Phillips, Mark D. Hopson, H. Blair White, David T. Pritikin*, and *Darryl L. DePriest* filed a brief for appellee American Bar Association.†

---

†Briefs of *amici curiae* urging affirmance were filed for the American Federation of Labor and Congress of Industrial Organizations by *Robert M. Weinberg, Walter A. Kamiat*, and *Laurence Gold;* and for the People for the American Way Action Fund et al. by *Timothy B. Dyk, Thomas F. Connell*, and *William L. Taylor*.

JUSTICE BRENNAN delivered the opinion of the Court.

The Department of Justice regularly seeks advice from the American Bar Association's Standing Committee on Federal Judiciary regarding potential nominees for federal judgeships. The question before us is whether the Federal Advisory Committee Act (FACA), 86 Stat. 770, as amended, 5 U. S. C. App. §1 *et seq.* (1982 ed. and Supp. V), applies to these consultations and, if it does, whether its application interferes unconstitutionally with the President's prerogative under Article II to nominate and appoint officers of the United States; violates the doctrine of separation of powers; or unduly infringes the First Amendment right of members of the American Bar Association to freedom of association and expression. We hold that FACA does not apply to this special advisory relationship. We therefore do not reach the constitutional questions presented.

## I

### A

The Constitution provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" Supreme Court Justices and, as established by Congress, other federal judges. Art. II, §2, cl. 2. Since 1952 the President, through the Department of Justice, has requested advice from the American Bar Association's Standing Committee on Federal Judiciary (ABA Committee) in making such nominations.

The American Bar Association is a private voluntary professional association of approximately 343,000 attorneys. It has several working committees, among them the advisory body whose work is at issue here. The ABA Committee consists of 14 persons belonging to, and chosen by, the American Bar Association. Each of the 12 federal judicial Circuits (not including the Federal Circuit) has one representative on the ABA Committee, except for the Ninth Circuit, which has

two; in addition, one member is chosen at large. The ABA Committee receives no federal funds. It does not recommend persons for appointment to the federal bench of its own initiative.

Prior to announcing the names of nominees for judgeships on the courts of appeals, the district courts, or the Court of International Trade, the President, acting through the Department of Justice, routinely requests a potential nominee to complete a questionnaire drawn up by the ABA Committee and to submit it to the Assistant Attorney General for the Office of Legal Policy, to the chair of the ABA Committee, and to the committee member (usually the representative of the relevant judicial Circuit) charged with investigating the nominee. See American Bar Association Standing Committee on Federal Judiciary, What It Is and How It Works (1983), reprinted in App. 43–49; Brief for Federal Appellee 2.[1] The potential nominee's answers and the referral of his or her name to the ABA Committee are kept confidential. The committee member conducting the investigation then reviews the legal writings of the potential nominee, interviews judges, legal scholars, and other attorneys regarding the potential nominee's qualifications, and discusses the matter confidentially with representatives of various professional organizations and other groups. The committee member also interviews the potential nominee, sometimes with other committee members in attendance.

Following the initial investigation, the committee representative prepares for the chair an informal written report describing the potential nominee's background, summarizing all interviews, assessing the candidate's qualifications, and recommending one of four possible ratings: "exceptionally well qualified," "well qualified," "qualified," or "not quali-

---

[1] The Justice Department does not ordinarily furnish the names of potential Supreme Court nominees to the ABA Committee for evaluation prior to their nomination, although in some instances the President has done so. See Brief for Federal Appellee 4–5.

fied."[2]   The chair then makes a confidential informal report
to the Attorney General's Office.   The chair's report dis-
closes the substance of the committee representative's report
to the chair, without revealing the identity of persons who
were interviewed, and indicates the evaluation the potential
nominee is likely to receive if the Department of Justice re-
quests a formal report.

If the Justice Department does request a formal report,
the committee representative prepares a draft and sends
copies to other members of the ABA Committee, together
with relevant materials.   A vote is then taken and a final
report approved.   The ABA Committee conveys its rating—
though not its final report—in confidence to the Department
of Justice, accompanied by a statement whether its rating
was supported by all committee members, or whether it only
commanded a majority or substantial majority of the ABA
Committee.   After considering the rating and other informa-
tion the President and his advisers have assembled, including
a report by the Federal Bureau of Investigation and addi-
tional interviews conducted by the President's judicial selec-
tion committee, the President then decides whether to nomi-
nate the candidate.   If the candidate is in fact nominated, the
ABA Committee's rating, but not its report, is made public at
the request of the Senate Judiciary Committee.[3]

B

FACA was born of a desire to assess the need for the "nu-
merous committees, boards, commissions, councils, and simi-

---

[2] The ratings now used in connection with Supreme Court nominees are
"well qualified," "not opposed," and "not qualified."   See American Bar
Association Standing Committee on Federal Judiciary, What It Is and How
It Works (1983), reprinted in App. 50.

[3] The Senate regularly requests the ABA Committee to rate Supreme
Court nominees if the Justice Department has not already sought the ABA
Committee's opinion.   As with nominees for other federal judgeships, the
ABA Committee's rating is made public at confirmation hearings before
the Senate Judiciary Committee.

lar groups which have been established to advise officers and agencies in the executive branch of the Federal Government." § 2(a), as set forth in 5 U. S. C. App. § 2(a).[4] Its purpose was to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature. § 2(b).

To attain these objectives, FACA directs the Director of the Office of Management and Budget and agency heads to establish various administrative guidelines and management controls for advisory committees. It also imposes a number of requirements on advisory groups. For example, FACA requires that each advisory committee file a charter, § 9(c), and keep detailed minutes of its meetings. § 10(c). Those meetings must be chaired or attended by an officer or employee of the Federal Government who is authorized to adjourn any meeting when he or she deems its adjournment in the public interest. § 10(e). FACA also requires advisory committees to provide advance notice of their meetings and to open them to the public, § 10(a), unless the President or the agency head to which an advisory committee reports determines that it may be closed to the public in accordance with the Government in the Sunshine Act, 5 U. S. C. § 552b(c). § 10(d). In addition, FACA stipulates that advisory committee minutes, records, and reports be made avail-

---

[4] Federal advisory committees are legion. During fiscal year 1988, 58 federal departments sponsored 1,020 advisory committees. General Services Administration, Seventeenth Annual Report of the President on Federal Advisory Committees 1 (1988). Over 3,500 meetings were held, and close to 1,000 reports were issued. *Ibid.* Costs for fiscal year 1988 totaled over $92 million, roughly half of which was spent on federal staff support. *Id.*, at 3.

able to the public, provided they do not fall within one of the Freedom of Information Act's exemptions, see 5 U. S. C. § 552, and the Government does not choose to withhold them. § 10(b). Advisory committees established by legislation or created by the President or other federal officials must also be "fairly balanced in terms of the points of view represented and the functions" they perform. §§ 5(b)(2), (c). Their existence is limited to two years, unless specifically exempted by the entity establishing them. § 14(a)(1).

### C

In October 1986, appellant Washington Legal Foundation (WLF) brought suit against the Department of Justice after the ABA Committee refused WLF's request for the names of potential judicial nominees it was considering and for the ABA Committee's reports and minutes of its meetings.[5] WLF asked the District Court for the District of Columbia to declare the ABA Committee an "advisory committee" as FACA defines that term. WLF further sought an injunction ordering the Justice Department to cease utilizing the ABA Committee as an advisory committee until it complied with FACA. In particular, WLF contended that the ABA Committee must file a charter, afford notice of its meetings, open those meetings to the public, and make its minutes, records, and reports available for public inspection and copying. See WLF Complaint, App. 5–11. The Justice Department moved to dismiss, arguing that the ABA Committee did not fall within FACA's definition of "advisory committee"

---

[5] WLF originally sued the ABA Committee, its members, and the American Bar Association, but not the Department of Justice. The District Court dismissed that complaint on the ground that the Justice Department was the proper defendant. *Washington Legal Foundation* v. *American Bar Assn. Standing Comm. on Federal Judiciary*, 648 F. Supp. 1353 (DC 1986). WLF's appeal on the issue whether a committee can be sued directly for noncompliance with FACA is pending before the Court of Appeals. See Brief for Appellant in No. 88–494, p. 10, n. 9.

and that, if it did, FACA would violate the constitutional doctrine of separation of powers.

Appellant Public Citizen then moved successfully to intervene as a party plaintiff. Like WLF, Public Citizen requested a declaration that the Justice Department's utilization of the ABA Committee is covered by FACA and an order enjoining the Justice Department to comply with FACA's requirements.

The District Court dismissed the action following oral argument. 691 F. Supp. 483 (1988). The court held that the Justice Department's use of the ABA Committee is subject to FACA's strictures, but that "FACA cannot constitutionally be applied to the ABA Committee because to do so would violate the express separation of nomination and consent powers set forth in Article II of the Constitution and because no overriding congressional interest in applying FACA to the ABA Committee has been demonstrated." Id., at 486. Congress' role in choosing judges "is limited to the Senate's advice and consent function," the court concluded; "the purposes of FACA are served through the public confirmation process and any need for applying FACA to the ABA Committee is outweighed by the President's interest in preserving confidentiality and freedom of consultation in selecting judicial nominees." Id., at 496. We noted probable jurisdiction, 488 U. S. 979 (1988), and now affirm on statutory grounds, making consideration of the relevant constitutional issues unnecessary.

## II

As a preliminary matter, appellee American Bar Association contests appellants' standing to bring this suit.[6] Appellee's challenge is twofold. First, it contends that neither appellant has alleged injury sufficiently concrete and specific to confer standing; rather, appellee maintains, they have

---

[6] The American Bar Association was not a party below, but intervened for purposes of this appeal after the District Court rendered judgment.

advanced a general grievance shared in substantially equal measure by all or a large class of citizens, and thus lack standing under our precedents. Brief for Appellee ABA 12–15. Second, appellee argues that even if appellants have asserted a sufficiently discrete injury, they have not demonstrated that a decision in their favor would likely redress the alleged harm, because the meetings they seek to attend and the minutes and records they wish to review would probably be closed to them under FACA. Hence, the American Bar Association submits, Article III bars their suit. *Id.*, at 15–17.

We reject these arguments. Appellee does not, and cannot, dispute that appellants are attempting to compel the Justice Department and the ABA Committee to comply with FACA's charter and notice requirements, and that they seek access to the ABA Committee's meetings and records in order to monitor its workings and participate more effectively in the judicial selection process. Appellant WLF has specifically requested, and been refused, the names of candidates under consideration by the ABA Committee, reports and minutes of the Committee's meetings, and advance notice of future meetings. WLF Complaint, App. 8. As when an agency denies requests for information under the Freedom of Information Act, refusal to permit appellants to scrutinize the ABA Committee's activities to the extent FACA allows constitutes a sufficiently distinct injury to provide standing to sue. Our decisions interpreting the Freedom of Information Act have never suggested that those requesting information under it need show more than that they sought and were denied specific agency records. See, *e. g.*, *Department of Justice* v. *Reporters Comm. for Freedom of Press*, 489 U. S. 749 (1989); *Department of Justice* v. *Julian*, 486 U. S. 1 (1988); *United States* v. *Weber Aircraft Corp.*, 465 U. S. 792 (1984); *FBI* v. *Abramson*, 456 U. S. 615 (1982); *Department of Air Force* v. *Rose*, 425 U. S. 352 (1976). There is no reason for a different rule here. The fact that other citizens

or groups of citizens might make the same complaint after unsuccessfully demanding disclosure under FACA does not lessen appellants' asserted injury, any more than the fact that numerous citizens might request the same information under the Freedom of Information Act entails that those who have been denied access do not possess a sufficient basis to sue.

We likewise find untenable the American Bar Association's claim that appellants lack standing because a ruling in their favor would not provide genuine relief as a result of FACA's exceptions to disclosure. Appellants acknowledge that many meetings of the ABA Committee might legitimately be closed to the public under FACA and that many documents might properly be shielded from public view. But they by no means concede that FACA licenses denying them access to *all* meetings and papers, or that it excuses noncompliance with FACA's other provisions. As Public Citizen contends, if FACA applies to the Justice Department's use of the ABA Committee without violating the Constitution, the ABA Committee will at least have to file a charter and give notice of its meetings. In addition, discussions and documents regarding the overall functioning of the ABA Committee, including its investigative, evaluative, and voting procedures, could well fall outside FACA's exemptions. See Reply Brief for Appellant in No. 88–429, pp. 5–6, and n. 3.

Indeed, it is difficult to square appellee's assertion that appellants cannot hope to gain noteworthy relief with its contention that "even more significant interference [than participation of Government officials in the ABA Committee's affairs] would result from the potential application of the 'public inspection' provisions of Section 10 of the Act." Brief for Appellee ABA 36. The American Bar Association explains: "Disclosure and public access are the rule under FACA; the exemptions generally are construed narrowly. In fact, the Government-in-the-Sunshine Act has *no* deliberative process privilege under which ABA Committee meet-

ings could be closed." *Id.*, at 38–39 (citations omitted). Appellee therefore concludes: "At bottom, there can be no question that application of FACA will impair the sensitive and necessarily confidential process of gathering information to assess accurately the qualifications and character of prospective judicial nominees." *Id.*, at 39. Whatever the merits of these claims and whatever their relevance to appellee's constitutional objections to FACA's applicability, they certainly show, as appellants contend, that appellants might gain significant relief if they prevail in their suit. Appellants' potential gains are undoubtedly sufficient to give them standing.[7]

## III

Section 3(2) of FACA, as set forth in 5 U. S. C. App. § 3(2), defines "advisory committee" as follows:

"For the purpose of this Act—

.        .        .        .        .

"(2) The term 'advisory committee' means any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof (hereafter in this paragraph referred to as 'committee'), which is—

"(A) established by statute or reorganization plan, or

"(B) established or utilized by the President, or

"(C) established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government, except that such term ex-

---

[7] The Justice Department concedes that appellants have standing to challenge the application of at least some of FACA's provisions to the Justice Department's consultations with the ABA Committee. See Brief for Federal Appellee 11–16. Because those challenges present the threshold question whether the ABA Committee constitutes an advisory committee for purposes of FACA, and because we hold that it does not, we need not address the Department's claim that appellants lack standing to contest the application of certain other provisions.

cludes (i) the Advisory Commission on Intergovernmental Relations, (ii) the Commission on Government Procurement, and (iii) any committee which is composed wholly of full-time officers or employees of the Federal Government."

Appellants agree that the ABA Committee was not "established" by the President or the Justice Department. See Brief for Appellant in No. 88–429, p. 16; Brief for Appellant in No. 88–494, pp. 13, 15–16, 21. Equally plainly, the ABA Committee is a committee that furnishes "advice or recommendations" to the President via the Justice Department. Whether the ABA Committee constitutes an "advisory committee" for purposes of FACA therefore depends upon whether it is "utilized" by the President or the Justice Department as Congress intended that term to be understood.

## A

There is no doubt that the Executive makes use of the ABA Committee, and thus "utilizes" it in one common sense of the term. As the District Court recognized, however, "reliance on the plain language of FACA alone is not entirely satisfactory." 691 F. Supp., at 488. "Utilize" is a woolly verb, its contours left undefined by the statute itself. Read unqualifiedly, it would extend FACA's requirements to any group of two or more persons, or at least any formal organization, from which the President or an Executive agency seeks advice.[8] We are convinced that Congress did not intend that result. A nodding acquaintance with FACA's pur-

---

[8] FACA provides exceptions for advisory committees established or utilized by the Central Intelligence Agency or the Federal Reserve System, § 4(b), as well as for "any local civic group whose primary function is that of rendering a public service with respect to a Federal program, or any State or local committee, council, board, commission, or similar group established to advise or make recommendations to State or local officials or agencies." § 4(c). The presence of these exceptions does little to curtail the almost unfettered breadth of a dictionary reading of FACA's definition of "advisory committee."

poses, as manifested by its legislative history and as recited in § 2 of the Act, reveals that it cannot have been Congress' intention, for example, to require the filing of a charter, the presence of a controlling federal official, and detailed minutes any time the President seeks the views of the National Association for the Advancement of Colored People (NAACP) before nominating Commissioners to the Equal Employment Opportunity Commission, or asks the leaders of an American Legion Post he is visiting for the organization's opinion on some aspect of military policy.

Nor can Congress have meant — as a straightforward reading of "utilize" would appear to require — that all of FACA's restrictions apply if a President consults with his own political party before picking his Cabinet. It was unmistakably *not* Congress' intention to intrude on a political party's freedom to conduct its affairs as it chooses, cf. *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214, 230 (1989), or its ability to advise elected officials who belong to that party, by placing a federal employee in charge of each advisory group meeting and making its minutes public property. FACA was enacted to cure specific ills, above all the wasteful expenditure of public funds for worthless committee meetings and biased proposals; although its reach is extensive, we cannot believe that it was intended to cover every formal and informal consultation between the President or an Executive agency and a group rendering advice.[9]  As we

---

[9] JUSTICE KENNEDY agrees with our conclusion that an unreflective reading of the term "utilize" would include the President's occasional consultations with groups such as the NAACP and committees of the President's own political party. See *post*, at 472. Having concluded that groups such as these are covered by the statute when they render advice, however, JUSTICE KENNEDY refuses to consult FACA's legislative history — which he later denounces, with surprising hyperbole, as "unauthoritative materials," *post*, at 473, although countless opinions of this Court, including many written by the concurring Justices, have rested on just such materials — because this result would not, in his estimation, be "absurd," *post*, at 472. Although this Court has never adopted so strict a

said in *Church of the Holy Trinity* v. *United States*, 143 U. S. 457, 459 (1892): "[F]requently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act."

Where the literal reading of a statutory term would "compel an odd result," *Green* v. *Bock Laundry Machine Co.*, 490 U. S. 504, 509 (1989), we must search for other evidence of congressional intent to lend the term its proper scope. See also, *e. g., Church of the Holy Trinity, supra,* at 472; *FDIC* v. *Philadelphia Gear Corp.*, 476 U. S. 426, 432 (1986). "The circumstances of the enactment of particular legislation," for example, "may persuade a court that Congress did not intend words of common meaning to have their literal effect." *Watt* v. *Alaska*, 451 U. S. 259, 266 (1981). Even though, as Judge Learned Hand said, "the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing," nevertheless "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary;

standard for reviewing committee reports, floor debates, and other non-statutory indications of congressional intent, *and we explicitly reject that standard today,* see also *infra,* at 455, even if "absurdity" were the test, one would think it was met here. The idea that Members of Congress would vote for a bill subjecting their own political parties to bureaucratic intrusion and public oversight when a President or Cabinet officer consults with party committees concerning political appointments is outlandish. Nor does it strike us as in any way "unhealthy," *post,* at 470, or undemocratic, *post,* at 473, to use all available materials in ascertaining the intent of our elected representatives, rather than read their enactments as requiring what may seem a disturbingly unlikely result, provided only that the result is not "absurd." Indeed, the sounder and more democratic course, the course that strives for allegiance to Congress' desires in all cases, not just those where Congress' statutory directive is plainly sensible or borders on the lunatic, is the traditional approach we reaffirm today.

but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Cabell* v. *Markham*, 148 F. 2d 737, 739 (CA2), aff'd, 326 U. S. 404 (1945). Looking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it seems inconsistent with Congress' intention, since the plain-meaning rule is "rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists." *Boston Sand & Gravel Co.* v. *United States*, 278 U. S. 41, 48 (1928) (Holmes, J.). See also *United States* v. *American Trucking Assns., Inc.*, 310 U. S. 534, 543–544 (1940) ("When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination'") (citations omitted).

Consideration of FACA's purposes and origins in determining whether the term "utilized" was meant to apply to the Justice Department's use of the ABA Committee is particularly appropriate here, given the importance we have consistently attached to interpreting statutes to avoid deciding difficult constitutional questions where the text fairly admits of a less problematic construction. See *infra*, at 465–467. It is therefore imperative that we consider indicators of congressional intent in addition to the statutory language before concluding that FACA was meant to cover the ABA Committee's provision of advice to the Justice Department in connection with judicial nominations.

B

Close attention to FACA's history is helpful, for FACA did not flare on the legislative scene with the suddenness of a meteor. Similar attempts to regulate the Federal Government's use of advisory committees were common during the 20 years preceding FACA's enactment. See Note, The Fed-

eral Advisory Committee Act, 10 Harv. J. Legis. 217, 219–221 (1973). An understanding of those efforts is essential to ascertain the intended scope of the term "utilize."

In 1950, the Justice Department issued guidelines for the operation of federal advisory committees in order to forestall their facilitation of anticompetitive behavior by bringing industry leaders together with Government approval. See Hearings on WOC's [Without Compensation Government employees] and Government Advisory Groups before the Antitrust Subcommittee of the House Committee on the Judiciary, 84th Cong., 1st Sess., pt. 1, pp. 586–587 (1955) (reprinting guidelines). Several years later, after the House Committee on Government Operations found that the Justice Department's guidelines were frequently ignored, Representative Fascell sponsored a bill that would have accorded the guidelines legal status. H. R. 7390, 85th Cong., 1st Sess. (1957). Although the bill would have required agencies to report to Congress on their use of advisory committees and would have subjected advisory committees to various controls, it apparently would not have imposed any requirements on private groups, not established by the Federal Government, whose advice was sought by the Executive. See H. R. Rep. No. 576, 85th Cong., 1st Sess., 5–7 (1957); 103 Cong. Rec. 11252 (1957) (remarks of Rep. Fascell and Rep. Vorys).

Despite Congress' failure to enact the bill, the Bureau of the Budget issued a directive in 1962 incorporating the bulk of the guidelines. See Perritt & Wilkinson, Open Advisory Committees and the Political Process: The Federal Advisory Committee Act After Two Years, 63 Geo. L. J. 725, 731 (1975). Later that year, President Kennedy issued Executive Order No. 11007, 3 CFR 573 (1959–1963 Comp.), which governed the functioning of advisory committees until FACA's passage. Executive Order No. 11007 is the probable source of the term "utilize" as later employed in FACA. The Order applied to advisory committees "formed by a

department or agency of the Government in the interest of obtaining advice or recommendations," or "not formed by a department or agency, but only during any period when it is being *utilized* by a department or agency in the same manner as a Government-formed advisory committee." § 2(a) (emphasis added). To a large extent, FACA adopted wholesale the provisions of Executive Order No. 11007. For example, like FACA, Executive Order No. 11007 stipulated that no advisory committee be formed or utilized unless authorized by law or determined as a matter of formal record by an agency head to be in the public interest, § 3; that all advisory committee meetings be held in the presence of a Government employee empowered to adjourn the meetings whenever he or she considered adjournment to be in the public interest, § 6(b); that meetings only occur at the call of, or with the advance approval of, a federal employee, § 6(a); that minutes be kept of the meetings, §§ 6(c), (d); and that committees terminate after two years unless a statute or an agency head decreed otherwise, § 8.

There is no indication, however, that Executive Order No. 11007 was intended to apply to the Justice Department's consultations with the ABA Committee. Neither President Kennedy, who issued the Order, nor President Johnson, nor President Nixon apparently deemed the ABA Committee to be "utilized" by the Department of Justice in the relevant sense of that term. Notwithstanding the ABA Committee's highly visible role in advising the Justice Department regarding potential judicial nominees, and notwithstanding the fact that the Order's requirements were established by the Executive itself rather than Congress, no President or Justice Department official applied them to the ABA Committee. As an entity formed privately, rather than at the Federal Government's prompting, to render confidential advice with respect to the President's constitutionally specified power to nominate federal judges—an entity in receipt of no federal funds and not amenable to the strict management by

agency officials envisaged by Executive Order No. 11007—
the ABA Committee cannot easily be said to have been "uti-
lized by a department or agency in the same manner as a
Government-formed advisory committee." That the Execu-
tive apparently did not consider the ABA Committee's activ-
ity within the terms of its own Executive Order is therefore
unsurprising.

Although FACA's legislative history evinces an intent to
widen the scope of Executive Order No. 11007's definition of
"advisory committee" by including "Presidential advisory
committees," which lay beyond the reach of Executive Order
No. 11007,[10] see H. R. Rep. No. 91–1731, pp. 9–10 (1970);
H. R. Rep. No. 92–1017, p. 4 (1972); S. Rep. No. 92–1098,
pp. 3–5, 7 (1972), as well as to augment the restrictions ap-

---

[10] Neither Public Citizen nor WLF contends that the ABA Committee is
a Presidential advisory committee as Congress understood that term.
Nor does it appear to be one. In a House Report on the effectiveness of
federal advisory committees, which provided the impetus for legislative
proposals that eventually produced FACA, the Committee on Government
Operations noted that Presidential committees were a special concern be-
cause they often consumed large amounts of federal money and were sub-
ject to no controls. The House Committee, however, defined "Presiden-
tial committee" narrowly, "as a group with either one or all of its members
appointed by the President with a function of advising or making recom-
mendations to him." H. R. Rep. No. 91–1731, p. 10 (1970). None of the
ABA Committee's members are appointed by the President, nor does the
ABA Committee report directly to him. The House and Senate Reports
accompanying early versions of FACA likewise referred to advisory com-
mittees "formed" or "established" or "organized" by the President, or to
committees created by an Act of Congress to advise the President—cate-
gories into which the ABA Committee cannot readily be fitted. See H. R.
Rep. No. 92–1017, pp. 4–5 (1972); S. Rep. No. 92–1098, p. 7 (1972). Al-
though FACA itself provides a more open-ended definition of "Presidential
advisory committee," applying it to "an advisory committee which advises
the President," § 3(4), as set forth in 5 U. S. C. § 3(4), that category is a
species of "advisory committee," and does not purport to cover committees
advising the President that were not "established or utilized" by him. As
FACA's legislative history reveals, the Presidential advisory committees
Congress intended FACA to reach do not include the ABA Committee.

plicable to advisory committees covered by the statute, there is scant reason to believe that Congress desired to bring the ABA Committee within FACA's net. FACA's principal purpose was to enhance the public accountability of advisory committees established by the Executive Branch and to reduce wasteful expenditures on them. That purpose could be accomplished, however, without expanding the coverage of Executive Order No. 11007 to include privately organized committees that received no federal funds. Indeed, there is considerable evidence that Congress sought nothing more than stricter compliance with reporting and other requirements—which *were* made more stringent—by advisory committees already covered by the Order and similar treatment of a small class of publicly funded groups created by the President.

The House bill which in its amended form became FACA applied exclusively to advisory committees "established" by statute or by the Executive, whether by a federal agency or by the President himself. H. R. 4383, 92d Cong., 2d Sess. § 3(2) (1972). Although the House Committee Report stated that the class of advisory committees was to include "committees which may have been organized before their advice was sought by the President or any agency, but which are used by the President or any agency in the same way as an advisory committee formed by the President himself or the agency itself," H. R. Rep. No. 92–1017, *supra,* at 4, it is questionable whether the Report's authors believed that the Justice Department used the ABA Committee in the same way as it used advisory committees it established. The phrase "used . . . in the same way" is reminiscent of Executive Order No. 11007's reference to advisory committees "utilized . . . in the same manner" as a committee established by the Federal Government, and the practice of three administrations demonstrates that Executive Order No. 11007 did not encompass the ABA Committee.

This inference draws support from the earlier House Report which instigated the legislative efforts that culminated in FACA. That Report complained that committees "utilized" by an agency—as opposed to those established directly by an agency—rarely complied with the requirements of Executive Order No. 11007. See H. R. Rep. No. 91–1731, *supra*, at 15. But it did not cite the ABA Committee or similar advisory committees as willful evaders of the Order. Rather, the Report's paradigmatic example of a committee "utilized" by an agency for purposes of Executive Order No. 11007 was an advisory committee established by a quasi-public organization in receipt of public funds, such as the National Academy of Sciences.[11] There is no indication in the Report that a purely private group like the ABA Committee that was not formed by the Executive, accepted no public funds, and assisted the Executive in performing a constitutionally specified task committed to the Executive was within the terms of Executive Order No. 11007 or was the type of advisory entity that legislation was urgently needed to address.

---

[11] The relevant paragraph of H. R. Rep. No. 91–1731, *supra*, at 15 (footnotes omitted), reads in full:

"The definition, further, states 'the term also includes any committee, board, . . . that is not formed by a department or agency, when it is being utilized by a department or agency in the same manner as a Government-formed advisory committee.' Rarely were such committees reported. A great number of the approximately 500 advisory committees of the National Academy of Sciences (NAS) and its affiliates possibly should be added to the above 1800 advisory committees as the NAS committees fall within the intent and literal definition of advisory committees under Executive Order 11007. The National Academy of Sciences was created by Congress as a semi-private organization for the explicit purpose of furnishing advice to the Government. This is done by the use of advisory committees. The Government meets the expense of investigations and reports prepared by the Academy committees at the request of the Government. Yet, very few of the Academy committees were reported by the agencies and departments of the Government."

Paralleling the initial House bill, the Senate bill that grew into FACA defined "advisory committee" as one "established or organized" by statute, the President, or an Executive agency. S. 3529, 92d Cong., 2d Sess. §§ 3(1), (2) (1972). Like the House Report, the accompanying Senate Report stated that the phrase "established or organized" was to be understood in its "most liberal sense, so that when an officer brings together a group by formal or informal means, by contract or other arrangement, and whether or not Federal money is expended, to obtain advice and information, such group is covered by the provisions of this bill." S. Rep. No. 92–1098, *supra*, at 8. While the Report manifested a clear intent not to restrict FACA's coverage to advisory committees funded by the Federal Government, it did not indicate any desire to bring all private advisory committees within FACA's terms. Indeed, the examples the Senate Report offers—"the Advisory Council on Federal Reports, the National Industrial Pollution Control Council, the National Petroleum Council, advisory councils to the National Institutes of Health, and committees of the national academies where they are utilized and officially recognized as advisory to the President, to an agency, or to a Government official," *ibid.*—are limited to groups organized by, or closely tied to, the Federal Government, and thus enjoying quasi-public status. Given the prominence of the ABA Committee's role and its familiarity to Members of Congress, its omission from the list of groups formed and maintained by private initiative to offer advice with respect to the President's nomination of Government officials is telling. If the examples offered by the Senate Committee on Government Operations are representative, as seems fair to surmise, then there is little reason to think that there was any support, at least at the committee stage, for going beyond the terms of Executive Order No. 11007 to regulate comprehensively the workings of the ABA Committee.

It is true that the final version of FACA approved by both Houses employed the phrase "established or utilized,"

and that this phrase is more capacious than the word "established" or the phrase "established or organized." But its genesis suggests that it was not intended to go much beyond those narrower formulations. The words "or utilized" were added by the Conference Committee to the definition included in the House bill. See H. R. Conf. Rep. No. 92–1403, p. 2 (1972). The Joint Explanatory Statement, however, said simply that the definition contained in the House bill was adopted "with modification." *Id.*, at 9. The Conference Report offered no indication that the modification was significant, let alone that it would substantially broaden FACA's application by sweeping within its terms a vast number of private groups, such as the Republican National Committee, not formed at the behest of the Executive or by quasi-public organizations whose opinions the Federal Government sometimes solicits. Indeed, it appears that the House bill's initial restricted focus on advisory committees established by the Federal Government, in an expanded sense of the word "established," was retained rather than enlarged by the Conference Committee. In the section dealing with FACA's range of application, the Conference Report stated: "The Act does not apply to persons or organizations which have contractual relationships with Federal agencies *nor to advisory committees not directly established by or for such agencies.*" *Id.*, at 10 (emphasis added). The phrase "or utilized" therefore appears to have been added simply to clarify that FACA applies to advisory committees established by the Federal Government in a generous sense of that term, encompassing groups formed indirectly by quasi-public organizations such as the National Academy of Sciences "for" public agencies as well as "by" such agencies themselves.

Read in this way, the term "utilized" would meet the concerns of the authors of House Report No. 91–1731 that advisory committees covered by Executive Order No. 11007, because they were "utilized by a department or agency in the same manner as a Government-formed advisory commit-

tee"—such as the groups organized by the National Academy of Sciences and its affiliates which the Report discussed— would be subject to FACA's requirements. And it comports well with the initial House and Senate bills' limited extension to advisory groups "established," on a broad understanding of that word, by the Federal Government, whether those groups were established by the Executive Branch or by statute or whether they were the offspring of some organization created or permeated by the Federal Government. Read in this way, however, the word "utilized" does not describe the Justice Department's use of the ABA Committee. Consultations between the Justice Department and the ABA Committee were not within the purview of Executive Order No. 11007, nor can the ABA Committee be said to have been formed by the Justice Department or by some semiprivate entity the Federal Government helped bring into being.

In sum, a literalistic reading of § 3(2) would bring the Justice Department's advisory relationship with the ABA Committee within FACA's terms, particularly given FACA's objective of opening many advisory relationships to public scrutiny except in certain narrowly defined situations.[12] A

---

[12] Appellants note as well that regulations of the General Services Administration (GSA), the agency responsible for administering FACA, define a "utilized" advisory committee as

"a committee or other group composed in whole or in part of other than full-time officers or employees of the Federal Government with an established existence outside the agency seeking its advice which the President or agency official(s) adopts, such as through institutional arrangements, as a preferred source from which to obtain advice or recommendations . . . in the same manner as that individual would obtain advice or recommendations from an established advisory committee." 41 CFR § 101–6.1003 (1988).

Appellants argue that the ABA Committee comes within the terms of this regulatory definition, because it exists outside the Justice Department and because it serves as a "preferred source" of advice, inasmuch as the ABA Committee's recommendations regarding potential judicial nominees are unfailingly requested and accorded considerably more weight than

literalistic reading, however, would catch far more groups and consulting arrangements than Congress could conceivably have intended. And the careful review which this interpretive difficulty warrants of earlier efforts to regulate

---

those advanced by other groups. See Brief for Appellant in No. 88–429, pp. 17–18; Brief for Appellant in No. 88–494, pp. 18–20.

This argument is not without force. For several reasons, however, we do not think it conclusive, either alone or together with appellants' arguments from FACA's text and legislative history. The first is that the regulation, like FACA's definition of "advisory committee," appears too sweeping to be read without qualification unless further investigation of congressional intent confirms that reading. And our review of FACA's legislative history and purposes demonstrates that the Justice Department, assisting the Executive's exercise of a constitutional power specifically assigned to the Executive alone, does not use the ABA Committee in what is obviously the "same manner" as federal agencies use other advisory committees established by them or by some other creature of the Federal Government.

Second, appellants' claim that the regulation applies to the ABA Committee is questionable. GSA publishes an annual report listing advisory committees covered by FACA. Although 17 reports have thus far been issued, not once has the ABA Committee been included in that list. The agency's own interpretation of its regulation thus appears to contradict the expansive construction appellants ask us to give it—a fact which, though not depriving the regulation's language of independent force, see *post*, at 479, nevertheless weakens the claim that the regulation applies to the Justice Department's use of the ABA Committee.

Third, even if the ABA Committee were covered by the regulation, appellants' case would not be appreciably bolstered. Deference to the agency's expertise in interpreting FACA is less appropriate here than it would be were the regulatory definition a contemporaneous construction of the statute, since the current definition was first promulgated in 1983, see 48 Fed. Reg. 19327 (1983), and did not become final until 1987, see 52 Fed. Reg. 45930 (1987)—more than a decade after FACA's passage. See, *e. g.*, *Aluminum Co. of America* v. *Central Lincoln Peoples' Utility Dist.*, 467 U. S. 380, 390 (1984); *Zenith Radio Corp.* v. *United States*, 437 U. S. 443, 450 (1978); *General Electric Co.* v. *Gilbert*, 429 U. S. 125, 142 (1976) (discounting significance of agency interpretive guideline promulgated eight years after statute's enactment, although fact that guideline contradicted agency's earlier position deemed "more importan[t]"); *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965); *Power Reactor Co.* v. *Electricians*, 367 U. S. 396,

federal advisory committees and the circumstances surrounding FACA's adoption strongly suggests that FACA's definition of "advisory committee" was not meant to encompass the ABA Committee's relationship with the Justice Department. That relationship seems not to have been within the contemplation of Executive Order No. 11007. And FACA's legislative history does not display an intent to widen the Order's application to encircle it. Weighing the deliberately inclusive statutory language against other evidence of congressional intent, it seems to us a close question whether FACA should be construed to apply to the ABA Committee, although on the whole we are fairly confident it should not. There is, however, one additional consideration which, in our view, tips the balance decisively against FACA's application.

## C

"When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible

---

408 (1961); *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, 315 (1933).

In addition, we owe GSA's regulation diminished deference for a reason independent of its not having been issued contemporaneously with FACA's passage. In *General Electric Co.* v. *Gilbert, supra,* we held that an agency's interpretive regulations not promulgated pursuant to express statutory authority should be accorded less weight than "administrative regulations which Congress has declared shall have the force of law, or to regulations which under the enabling statute may themselves supply the basis for imposition of liability." *Id.,* at 141 (citations omitted). GSA's regulatory definition falls into neither category. Section 7(c), as set forth in 5 U. S. C. App. § 7(c), authorizes the Administrator to "prescribe administrative guidelines and management controls applicable to advisory committees, and, to the maximum extent feasible, provide advice, assistance, and guidance to advisory committees to improve their performance." It does not empower the agency to issue, in addition to these guidelines, a regulatory definition of "advisory committee" carrying the force of law. JUSTICE KENNEDY's assertion that GSA's interpretation of FACA's provisions is "binding," *post,* at 478, 480, confuses wish with reality.

by which the question may be avoided." *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932) (footnote collecting citations omitted). It has long been an axiom of statutory interpretation that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U. S. 568, 575 (1988). See also *St. Martin Evangelical Lutheran Church* v. *South Dakota*, 451 U. S. 772, 780 (1981); *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 500–501 (1979); *Machinists* v. *Street*, 367 U. S. 740, 749–750 (1961). This approach, we said recently, "not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution." *Edward J. DeBartolo Corp.*, *supra*, at 575. Our reluctance to decide constitutional issues is especially great where, as here, they concern the relative powers of coordinate branches of government. See *American Foreign Service Assn.* v. *Garfinkel*, 490 U. S. 153, 161 (1989) *(per curiam)*. Hence, we are loath to conclude that Congress intended to press ahead into dangerous constitutional thickets in the absence of firm evidence that it courted those perils.

That construing FACA to apply to the Justice Department's consultations with the ABA Committee would present formidable constitutional difficulties is undeniable. The District Court declared FACA unconstitutional insofar as it applied to those consultations, because it concluded that FACA, so applied, infringed unduly on the President's Article II power to nominate federal judges and violated the doctrine of separation of powers.[13] Whether or not the court's conclu-

---

[13] In addition, appellee American Bar Association contends that application of FACA to the ABA Committee would impermissibly interfere with the associational and expressive rights guaranteed its members by the

sion was correct, there is no gainsaying the seriousness of these constitutional challenges.

To be sure, "[w]e cannot press statutory construction 'to the point of disingenuous evasion' even to avoid a constitutional question." *United States* v. *Locke,* 471 U. S. 84, 96 (1985), quoting *Moore Ice Cream Co.* v. *Rose,* 289 U. S. 373, 379 (1933). But unlike in *Locke,* where "nothing in the legislative history remotely suggest[ed] a congressional intent contrary to Congress' chosen words," 471 U. S., at 96, our review of the regulatory scheme prior to FACA's enactment and the likely origin of the phrase "or utilized" in FACA's definition of "advisory committee" reveals that Congress probably did not intend to subject the ABA Committee to FACA's requirements when the ABA Committee offers confidential advice regarding Presidential appointments to the federal bench. Where the competing arguments based on FACA's text and legislative history, though both plausible, tend to show that Congress did not desire FACA to apply to the Justice Department's confidential solicitation of the ABA Committee's views on prospective judicial nominees, sound sense counsels adherence to our rule of caution. Our unwillingness to resolve important constitutional questions unnecessarily thus solidifies our conviction that FACA is inapplicable.

The judgment of the District Court is

*Affirmed.*

JUSTICE SCALIA took no part in the consideration or decision of these cases.

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, concurring in the judgment.

"In a government, where the liberties of the people are to be preserved . . . , the executive, legislative and judicial, should ever be separate and distinct, and consist

---

First Amendment. See Brief for Appellee ABA 40–48; Brief for People for the American Way Action Fund and Alliance for Justice as *Amicus Curiae* 22–29.

of parts, mutually forming a check upon each other." C. Pinckney, Observations on the Plan of Government Submitted to the Federal Convention of May 28, 1787, reprinted in 3 M. Farrand, Records of the Federal Convention of 1787, p. 108 (rev. ed. 1966).

The Framers of our Government knew that the most precious of liberties could remain secure only if they created a structure of Government based on a permanent separation of powers. See, *e. g.*, The Federalist Nos. 47–51 (J. Madison). Indeed, the Framers devoted almost the whole of their attention at the Constitutional Convention to the creation of a secure and enduring structure for the new Government. It remains one of the most vital functions of this Court to police with care the separation of the governing powers. That is so even when, as is the case here, no immediate threat to liberty is apparent. When structure fails, liberty is always in peril. As Justice Frankfurter stated:

> "The accretion of dangerous power does not come in a day. It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 594 (1952) (concurring opinion).

Although one is perhaps more obvious than the other, this suit presents two distinct issues of the separation of powers. The first concerns the rules this Court must follow in interpreting a statute passed by Congress and signed by the President. On this subject, I cannot join the Court's conclusion that the Federal Advisory Committee Act (FACA), 85 Stat. 770, as amended, 5 U. S. C. App. § 1 *et seq.* (1982 ed. and Supp. V), does not cover the activities of the American Bar Association's Standing Committee on Federal Judiciary in advising the Department of Justice regarding potential nominees for federal judgeships. The result seems sensible in the abstract; but I cannot accept the method by which the Court

arrives at its interpretation of FACA, which does not accord proper respect to the finality and binding effect of legislative enactments. The second question in the case is the extent to which Congress may interfere with the President's constitutional prerogative to nominate federal judges. On this issue, which the Court does not reach because of its conclusion on the statutory question, I think it quite plain that the application of FACA to the Government's use of the ABA Committee is unconstitutional.

I

The statutory question in this suit is simple enough to formulate. FACA applies to "any committee" that is "established or utilized" by the President or one or more agencies, and which furnishes "advice or recommendations" to the President or one or more agencies. 5 U. S. C. App. § 3(2). All concede that the ABA Committee furnishes advice and recommendations to the Department of Justice and through it to the President. *Ante*, at 452. The only question we face, therefore, is whether the ABA Committee is "utilized" by the Department of Justice or the President. See *ibid.*

There is a ready starting point, which ought to serve also as a sufficient stopping point, for this kind of analysis: the plain language of the statute. Yet the Court is unwilling to rest on this foundation, for several reasons. One is an evident unwillingness to define the application of the statute in terms of the ordinary meaning of its language. We are told that "utilize" is "a woolly verb," *ibid.*, and therefore we cannot be content to rely on what is described, with varying levels of animus, as a "literal reading," *ante*, at 454, a "literalistic reading," *ante*, at 463, 464, and "a dictionary reading" of this word, *ante*, at 452, n. 8. We also are told in no uncertain terms that we cannot rely on (what I happen to regard as a more accurate description) "a straightforward reading of 'utilize.'" *Ante*, at 453. Reluctance to working with the basic meaning of words in a normal manner undermines the legal process. These cases demonstrate that reluctance of this

sort leads instead to woolly judicial construction that mars the plain face of legislative enactments.

The Court concedes that the Executive Branch "utilizes" the ABA Committee in the common sense of that word. *Ibid.* Indeed, this point cannot be contested. As the Court's own recitation of the facts makes clear, the Department of Justice has, over the last four decades, made regular use of the ABA Committee to investigate the background of potential nominees and to make critical recommendations regarding their qualifications. See *ante,* at 443–445. This should end the matter. The Court nevertheless goes through several more steps to conclude that, although "it seems to us a close question," *ante,* at 465, Congress did not intend that FACA would apply to the ABA Committee.

Although I believe the Court's result is quite sensible, I cannot go along with the unhealthy process of amending the statute by judicial interpretation. Where the language of a statute is clear in its application, the normal rule is that we are bound by it. There is, of course, a legitimate exception to this rule, which the Court invokes, see *ante,* at 453–454, citing *Church of the Holy Trinity* v. *United States,* 143 U. S. 457, 459 (1892), and with which I have no quarrel. Where the plain language of the statute would lead to "patently absurd consequences," *United States* v. *Brown,* 333 U. S. 18, 27 (1948), that "Congress could not *possibly* have intended," *FBI* v. *Abramson,* 456 U. S. 615, 640 (1982) (O'CONNOR, J., dissenting) (emphasis added), we need not apply the language in such a fashion. When used in a proper manner, this narrow exception to our normal rule of statutory construction does not intrude upon the lawmaking powers of Congress, but rather demonstrates a respect for the coequal Legislative Branch, which we assume would not act in an absurd way.

This exception remains a legitimate tool of the Judiciary, however, only as long as the Court acts with self-discipline by limiting the exception to situations where the result of applying the plain language would be, in a genuine sense, absurd,

*i. e.*, where it is quite impossible that Congress could have intended the result, see *ibid.*, and where the alleged absurdity is so clear as to be obvious to most anyone. A few examples of true absurdity are given in the *Holy Trinity* decision cited by the Court, *ante*, at 454, such as where a sheriff was prosecuted for obstructing the mails even though he was executing a warrant to arrest the mail carrier for murder, or where a medieval law against drawing blood in the streets was to be applied against a physician who came to the aid of a man who had fallen down in a fit. See 143 U. S., at 460–461. In today's opinion, however, the Court disregards the plain language of the statute not because its application would be patently absurd, but rather because, on the basis of its view of the legislative history, the Court is "fairly confident" that "FACA should [not] be construed to apply to the ABA Committee." *Ante*, at 465. I believe the Court's loose invocation of the "absurd result" canon of statutory construction creates too great a risk that the Court is exercising its own "WILL instead of JUDGMENT," with the consequence of "substituti[ng] [its own] pleasure to that of the legislative body." The Federalist No. 78, p. 469 (C. Rossiter ed. 1961) (A. Hamilton).

The Court makes only a passing effort to show that it would be absurd to apply the term "utilize" to the ABA Committee according to its commonsense meaning. It offers three examples that we can assume are meant to demonstrate this point: the application of FACA to an American Legion Post should the President visit that organization and happen to ask its opinion on some aspect of military policy; the application of FACA to the meetings of the National Association for the Advancement of Colored People (NAACP) should the President seek its views in nominating Commissioners to the Equal Employment Opportunity Commission; and the application of FACA to the national committee of the President's political party should he consult it for advice and

recommendations before picking his Cabinet. See *ante*, at 452–453.

None of these examples demonstrate the kind of absurd consequences that would justify departure from the plain language of the statute. A commonsense interpretation of the term "utilize" would not necessarily reach the kind of ad hoc contact with a private group that is contemplated by the Court's American Legion hypothetical. Such an interpretation would be consistent, moreover, with the regulation of the General Services Administration (GSA) interpreting the word "utilize," which the Court in effect ignores. See *infra*, at 477. As for the more regular use contemplated by the Court's examples concerning the NAACP and the national committee of the President's political party, it would not be at all absurd to say that, under the Court's hypothetical, these groups would be "utilized" by the President to obtain "advice or recommendations" on appointments, and therefore would fall within the coverage of the statute. Rather, what is troublesome about these examples is that they raise the very same serious constitutional questions that confront us here (and perhaps others as well).[1] The Court confuses the two points. The fact that a particular application of the clear terms of a statute might be unconstitutional does not, in and of itself, render a straightforward application of the language absurd, so as to allow us to conclude that the statute does not apply. See *infra*, at 481.

Unable to show that an application of FACA according the plain meaning of its terms would be absurd, the Court turns instead to the task of demonstrating that a straightforward reading of the statute would be inconsistent with the congressional purposes that lay behind its passage. To the student of statutory construction, this move is a familiar one. It is, as the Court identifies it, the classic *Holy Trinity* argument. "[A] thing may be within the letter of the statute and

---

[1] I do not address here any possible problems under the First Amendment with the application of FACA to the ABA Committee.

yet not within the statute, because not within its spirit, nor within the intention of its makers." *Holy Trinity, supra,* at 459. I cannot embrace this principle. Where it is clear that the unambiguous language of a statute embraces certain conduct, and it would not be patently absurd to apply the statute to such conduct, it does not foster a democratic exegesis for this Court to rummage through unauthoritative materials to consult the spirit of the legislation in order to discover an alternative interpretation of the statute with which the Court is more comfortable. It comes as a surprise to no one that the result of the Court's lengthy journey through the legislative history is the discovery of a congressional intent not to include the activities of the ABA Committee within the coverage of FACA. The problem with spirits is that they tend to reflect less the views of the world whence they come than the views of those who seek their advice.

Lest anyone think that my objection to the use of the *Holy Trinity* doctrine is a mere point of interpretive purity divorced from more practical considerations, I should pause for a moment to recall the unhappy genesis of that doctrine and its unwelcome potential. In *Holy Trinity,* the Court was faced with the interpretation of a statute which made it unlawful for

> "any person, company, partnership, or corporation, in any manner whatsoever, to prepay the transportation, or in any way assist or encourage the importation or migration of any alien or aliens, any foreigner or foreigners, into the United States . . . , under contract or agreement . . . made previous to the importation or migration of such alien or aliens, foreigner or foreigners, to perform labor or service of any kind in the United States." 143 U. S., at 458.

The Church of the Holy Trinity entered into a contract with an alien residing in England to come to the United States to serve as the director and pastor of the church. Notwithstanding the fact that this agreement fell within the plain lan-

guage of the statute, which was conceded to be the case, see *ibid.*, the Court overrode the plain language, drawing instead on the background and purposes of the statute to conclude that Congress did not intend its broad prohibition to cover the importation of Christian ministers. The central support for the Court's ultimate conclusion that Congress did not intend the law to cover Christian ministers is its lengthy review of the "mass of organic utterances" establishing that "this is a Christian nation," and which were taken to prove that it could not "be believed that a Congress of the United States intended to make it a misdemeanor for a church of this country to contract for the services of a Christian minister residing in another nation." *Id.*, at 471. I should think the potential of this doctrine to allow judges to substitute their personal predelictions for the will of the Congress is so self-evident from the case which spawned it as to require no further discussion of its susceptibility to abuse.

Even if I were inclined to disregard the unambiguous language of FACA, I could not join the Court's conclusions with regard to Congress' purposes. I find the Court's treatment of the legislative history one sided and offer a few observations on the difficulties of perceiving the true contours of a spirit.

The first problem with the Court's use of legislative history is the questionable relevance of its detailed account of Executive practice before the enactment of FACA. This background is interesting but not instructive, for as the Court acknowledges, even the legislative history as presented by the Court "evinces an intent to widen the scope of" the coverage of prior Executive Orders, *ante*, at 458, and in any event the language of the statute is "more capacious" than any of the previous "narrower formulations," *ante*, at 462. Indeed, Congress would have had little reason to legislate at all in this area if it had intended FACA to be nothing more than a reflection of the provisions of Executive Order No. 11007, 3 CFR 573 (1959–1963 Comp.), which was already the settled

and governing law at the time this bill was introduced, considered, and enacted. In other words, the background to FACA cannot be taken to illuminate its breadth precisely because FACA altered the landscape to address the many concerns Congress had about the increasing growth and use of advisory committees.

Another problem with the Court's approach lies in its narrow preoccupation with the ABA Committee against the background of a bill that was intended to provide comprehensive legislation covering a widespread problem in the organization and operation of the Federal Government. The Court's discussion takes portentous note of the fact that Congress did not mention or discuss the ABA Committee by name in the materials that preceded the enactment of FACA. But that is hardly a remarkable fact. The legislation was passed at a time when somewhere between 1,800 and 3,200 target committees were thought to be in existence, see S. Rep. No. 92–1098, pp. 3, 4 (1972), and the congressional Reports mentioned few committees by name. More to the point, its argument reflects an incorrect understanding of the kinds of laws Congress passes: it usually does not legislate by specifying examples, but by identifying broad and general principles that must be applied to particular factual instances. And that is true of FACA.

Finally, though the stated objective of the Court's inquiry into legislative history is the identification of Congress' purposes in passing FACA, the inquiry does not focus on the most obvious place for finding those purposes, which is the section of the Conference Committee Report entitled "Findings and Purposes." That section lists six findings and purposes that underlie FACA:

> "(1) the need for many existing advisory committees has not been adequately reviewed;
>
> "(2) new advisory committees should be established only when they are determined to be essential and their number should be kept to the minimum necessary;

"(3) advisory committees should be terminated when they are no longer carrying out the purposes for which they were established;

"(4) standards and uniform procedures should govern the establishment, operation, administration, and duration of advisory committees;

"(5) the Congress and the public should be kept informed with respect to the number, purpose, membership, activities, and cost of advisory committees; and

"(6) the function of advisory committees should be advisory only, and that all matters under their consideration should be determined, in accordance with law, by the official, agency, or officer involved." H. R. Conf. Rep. No. 92–1403, pp. 1–2 (1972).

The most pertinent conclusion to be drawn from this list of purposes is that all of them are implicated by the Justice Department's use of the ABA Committee. In addition, it shows that Congress' stated purposes for addressing the use of advisory committees went well beyond the amount of public funds devoted to their operations, which in any event is not the sole component in the cost of their use; thus the Court errs in focusing on this point.

It is most striking that this section of the Conference Committee Report, which contains Congress' own explicit statement of its purposes in adopting FACA, receives no mention by the Court on its amble through the legislative history. The one statement the Court does quote from this Report, that FACA does not apply "'to advisory committees not directly established by or for [federal] agencies,'" *ante*, at 462, quoting H. R. Conf. Rep. 92–1403, *supra*, at 10 (emphasis deleted), is of uncertain value. It is not clear that this passage would exclude the ABA Committee, which was established in 1946 and began almost at once to advise the Government on judicial nominees. It also is not clear why the reasons a committee was formed should determine whether and how they are "utilized by" the Government, or how this consideration

can be squared with the plain language of the statute. The Court professes puzzlement because the Report says only that the Conference Committee modified the definition of "advisory committee" to include the phrase "or utilized," but does not explain the extent of the modification in any detail. *Ante*, at 461–462. One would have thought at least that the Court would have been led to consider how the specific purposes Congress identified for this legislation might shed light on the reasons for the change.

Not only does the Court's decision today give inadequate respect to the statute passed by Congress, it also gives inadequate deference to the GSA's regulations interpreting FACA. I have already mentioned that, under the GSA's interpretation of FACA, the Court's hypothetical applications of the Act to groups such as the American Legion are impossible. More important, however, it is plain that, under the GSA's regulations, the ABA Committee is covered by the Act. The GSA defines a "utilized" advisory committee as

> "a committee or other group composed in whole or in part of other than full-time officers or employees of the Federal Government with an established existence outside the agency seeking its advice which the President or agency official(s) adopts, such as through institutional arrangements, as a preferred source from which to obtain advice or recommendations on a specific issue or policy within the scope of his or her responsibilities in the same manner as that individual would obtain advice or recommendations from an established advisory committee." 41 CFR § 101–6.1003 (1988).

I cannot imagine a better description of the function of the ABA Committee. *First*, the ABA Committee is "composed in whole or in part of other than full-time officers or employees of the Federal Government." *Second*, the committee has "an established existence outside the agency seeking its advice." *Third*, the committee has been adopted by the Department of Justice "as a preferred source from which to ob-

tain advice or recommendations of a specific issue or policy." Indeed, the committee performs no other significant function beyond advising the Government on judicial appointments. *Fourth*, the relation is carried out through what cannot in fairness be denied, after four decades, to be an "institutional arrangement." The committee's views are sought on a regular and frequent basis, are given careful consideration, and are usually followed by the Department. *Fifth*, the committee is used to obtain advice and recommendations on judicial appointments "in the same manner as . . . an established advisory committee." In this regard, it is pertinent that the Department discloses to the committee the names of the candidates and other confidential Government information. This unusual privilege is normally accorded only to other parts of the Government.

The Court concedes that the regulations present difficulties for its conclusion that FACA does not apply to the ABA Committee. *Ante*, at 464, n. 12. It nevertheless relegates its entire discussion of this controlling point to a footnote appended as a ragged afterthought to its extensive discussion of the legislative history. See *ante*, at 463–465, n. 12. The Court offers four reasons for slighting the agency's interpretation in favor of its own. First, we are told that the language of the GSA regulations, like the statute itself, "appears too sweeping" to be read according to its terms. Of course, once again the Court does not mean either that the agency regulation is not a reasonable interpretation of the plain language of the statute, or that the agency interpretation itself would produce absurd consequences. Rather, what the Court means is that the agency regulation is not entirely consistent with the "spirit" of the Act which it professes to have divined from the legislative history. I do not think this a sound reason for ignoring the binding interpretation of the statute rendered by the implementing agency.

Second, the Court tells us that it "is questionable" whether the GSA regulations apply to the ABA Committee. This is

quite wrong. The Court does not deny that the committee falls squarely within the terms of the regulations. The Court's doubts on this issue stem entirely from the fact that the GSA's annual report does not list the ABA Committee as one of the advisory committees covered by FACA. But it seems to me to be without relevance one way or the other whether the GSA is *aware* that the regulations cover the committee. What matters is that the regulations the GSA adopted, which contain a very reasonable interpretation of the statute, plainly cover the committee. If the Court's interpretive approach on this issue were accepted, then the text of the agency's regulations, for which notice was afforded and upon which comment was received, would be of no independent force.

Third, the Court notes that the agency's interpretation was not promulgated until 1983 and not made final until 1987, whereas FACA was passed in 1972. I cannot imagine why it is a sensible principle that an agency regulation which is promulgated a decade after the initial passage of a statute should be given *less* deference because of the mere passage of time. I would not draw any such distinction one way or the other, but if anything one would think that the GSA's regulation should be entitled to *more* deference than a regulation promulgated immediately after the passage of a bill, for at least in the situation we have here, we can have some assurance that GSA thought long and hard, based upon considerable experience and the benefits of extensive notice and comment, before it promulgated an administrative rule that has the binding force of law.

The primary case cited in support of the Court's view, see *ante*, at 464–465, n. 12, citing *General Electric Co.* v. *Gilbert*, 429 U. S. 125 (1976), is not at all pertinent. Although in *Gilbert* the Court mentioned the passage of time in its discussion of the regulations, it made nothing of this point on its own but instead refused to defer to the regulations because they "flatly contradict[ed] the position which the agency had enun-

ciated at an earlier date, closer to the enactment of the governing statute." *Id.*, at 142. Here, however, the GSA's regulations are consistent with a memorandum prepared by the Office of Management and Budget and distributed to all Government agencies immediately after FACA was enacted. See 38 Fed. Reg. 2307 (1973) (the "utilized by" language of FACA would apply, for example, "to an already existing organization of scholars enlisted by an agency to provide advice on a continuing basis").[2]

The fourth justification the Court offers for ignoring the agency's interpretation is that the GSA lacks statutory authority to issue a binding regulatory interpretation of the term "advisory committee." In *Gilbert*, for example, the agency which adopted the regulations at issue did not act pursuant to explicit statutory authority to promulgate regulations, and thus its regulations were at most of persuasive rather than controlling force. 429 U. S., at 141–142. But the Court errs in suggesting that the GSA's regulations are mere nonbinding administrative guidelines. The GSA is conceded to be the agency "charged with the administration of [FACA]," *Blum* v. *Bacon*, 457 U. S. 132, 141 (1982); see *ante*, at 463, n. 12; it possesses statutory authority to implement the law by promulgating regulations and performing various other specific tasks that have binding effect on other Government agencies and all advisory committees, see FACA, 5 U. S. C. App. §§ 4(a), 7(a)–7(e), 10(a)(2), 10(a)(3) (1982 ed. and Supp. V); see also 40 U. S. C. § 486(c) (granting statutory authority for the GSA to promulgate regulations

---

[2] Although the Court cites six cases to support the view that a noncontemporaneous agency interpretation of the governing statute is entitled to less deference from a reviewing court, five of the cases do not stand for that proposition, but only quote one another on the general issue. In fact, in those cases the Court did defer to agency regulations because they were promulgated pursuant to statutory authority, constituted reasonable interpretations and practical applications of the statutory language, and reflected a consistent agency position of long standing. See *ante*, at 464–465, n. 12 (citing cases). All those points are true in the cases before us.

necessary to implement the Federal Property and Administrative Services Act of 1949), and it issued its regulations pursuant to that authority, see 41 CFR §§ 101–6.1001 to 101–6.1035 (1988).

In sum, it is quite desirable not to apply FACA to the ABA Committee. I cannot, however, reach this conclusion as a matter of fair statutory construction. The plain and ordinary meaning of the language passed by Congress governs, and its application does not lead to any absurd results. An unnecessary recourse to the legislative history only confirms this conclusion. And the reasonable and controlling interpretation of the statute adopted by the agency charged with its implementation is also in accord.

The Court's final step is to summon up the traditional principle that statutes should be construed to avoid constitutional questions. Although I agree that we should "first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided," *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932), this principle cannot be stretched beyond the point at which such a construction remains *"fairly* possible." And it should not be given too broad a scope lest a whole new range of Government action be proscribed by interpretive shadows cast by constitutional provisions that might or might not invalidate it. The fact that a particular application of the clear terms of a statute might be unconstitutional does not provide us with a justification for ignoring the plain meaning of the statute. If that were permissible, then the power of judicial review of legislation could be made unnecessary, for whenever the application of a statute would have potential inconsistency with the Constitution, we could merely opine that the statute did not cover the conduct in question because it would be discomforting or even absurd to think that Congress intended to act in an unconstitutional manner. The utter circularity of this approach explains why it has never been our rule.

The Court's ultimate interpretation of FACA is never clearly stated, except for the conclusion that the ABA Committee is not covered. It seems to read the "utilized by" portion of the statute as encompassing only a committee "established by a quasi-public organization in receipt of public funds," *ante*, at 460, or encompassing "groups formed indirectly by quasi-public organizations such as the National Academy of Sciences," *ante*, at 462. This is not a "fairly possible" construction of the statutory language even to a generous reader. I would find the ABA Committee to be covered by FACA. It is, therefore, necessary for me to reach and decide the constitutional issue presented.

## II

Although I disagree with the Court's conclusion that FACA does not cover the Justice Department's use of the ABA Committee, I concur in the judgment of the Court because, in my view, the application of FACA in this context would be a plain violation of the Appointments Clause of the Constitution.

The essential feature of the separation-of-powers issue in this suit, and the one that dictates the result, is that this application of the statute encroaches upon a power that the text of the Constitution commits in explicit terms to the President. Article II, § 2, cl. 2, of the Constitution provides as follows:

"[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of he supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the Presi-

dent alone, in the Courts of Law, or in the Heads of Departments."[3]

By its terms, the Clause divides the appointment power into two separate spheres: the President's power to "nominate," and the Senate's power to give or withhold its "Advice and Consent." No role whatsoever is given either to the Senate or to Congress as a whole in the process of choosing the person who will be nominated for appointment. As Hamilton emphasized:

> "In the act of nomination, [the President's] judgment *alone* would be exercised; and as it would be his *sole* duty to point out the man who, with the approbation of the Senate, should fill an office, his responsibility would be as *complete* as if he were to make the final appointment." The Federalist No. 76, 456–457 (C. Rossiter ed. 1961) (emphasis added).

And again:

> "It will be the office of the President to *nominate*, and, with the advice and consent of the Senate, to *appoint*. There will, of course, be no exertion of *choice* on the part of the Senate. They may defeat one choice of the Executive, and oblige him to make another; but they cannot themselves *choose*—they can only ratify or reject the choice he may have made." *Id.*, No. 66, at 405 (emphasis in original).[4]

---

[3] No issue has been raised in this suit with respect to the Congress' power to vest the appointment of "inferior" officers in anyone other than the President. Cf. *Morrison* v. *Olson*, 487 U. S. 654, 673–677 (1988).

[4] Hamilton also explained why it is that the President was given the sole prerogative of nominating principal officers:

"The sole and undivided responsibility of one man will naturally beget a livelier sense of duty and a more exact regard to reputation. He will, on this account, feel himself under stronger obligations, and more interested to investigate with care the qualities requisite to the stations to be filled, and to prefer with impartiality the persons who may have the fairest pretensions to them." The Federalist No. 76, at 455–456.

Indeed, the sole limitation on the President's power to nominate these officials is found in the Incompatability Clause, which provides that "[n]o Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been increased during such time." U. S. Const., Art. I, § 6, cl. 2.

In some of our more recent cases involving the powers and prerogatives of the President, we have employed something of a balancing approach, asking whether the statute at issue prevents the President " 'from accomplishing [his] constitutionally assigned functions.' " *Morrison* v. *Olson,* 487 U. S. 654, 695 (1988), quoting *Nixon* v. *Administrator of General Services,* 433 U. S. 425, 443 (1977), and whether the extent of the intrusion on the President's powers "is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Ibid.* In each of these cases, the power at issue was not explicitly assigned by the text of the Constitution to be within the sole province of the President, but rather was thought to be encompassed within the general grant to the President of the "executive Power." U. S. Const., Art. II, § 1, cl. 1. Thus, for example, the relevant aspect of our decision in *Morrison* involved the President's power to remove Executive officers, a power we had recognized is not conferred by any explicit provision in the text of the Constitution (as is the appointment power), but rather is inferred to be a necessary part of the grant of the "executive Power." See *Myers* v. *United States,* 272 U. S. 52, 115–116 (1926). Similarly, in *Administrator of General Services, supra,* we were confronted with the question of the Executive Branch's power to control the disposition of Presidential materials, a matter which, though vital to the President's ability to perform his assigned functions, is not given to exclusive Presidential control by any explicit provision in the Constitution itself. We said there that "the proper in-

quiry focuses on the extent to which [the congressional restriction] prevents the Executive Branch from accomplishing its constitutionally assigned functions," and that we would invalidate the statute only if the potential for disruption of the President's constitutional functions were present and if "that impact [were not] justified by an overriding need to promote objectives within the constitutional authority of Congress." 433 U. S., at 443. See also *United States* v. *Nixon*, 418 U. S. 683, 703–707 (1974) (Executive privilege).

In a line of cases of equal weight and authority, however, where the Constitution by explicit text commits the power at issue to the exclusive control of the President, we have refused to tolerate *any* intrusion by the Legislative Branch. For example, the Constitution confers upon the President the "Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment." U. S. Const., Art. II, § 2, cl. 1. In *United States* v. *Klein*, 13 Wall. 128 (1872), the Court considered a federal statute that allowed citizens who had remained loyal to the Union during the Civil War to recover compensation for property abandoned to Union troops during the War. At issue was the validity of a provision in the statute that barred the admission of a Presidential pardon in such actions as proof of loyalty. Although this provision did not impose direct restrictions on the President's power to pardon, the Court held that the Congress could not in any manner limit the full legal effect of the President's power. As we said there: "[I]t is clear that the legislature cannot change the effect of . . . a pardon any more than the executive can change a law." *Id.*, at 148. More than a century later, in *Schick* v. *Reed*, 419 U. S. 256 (1974), we reiterated in most direct terms the principle that Congress cannot interfere in any way with the President's power to pardon. The pardon power "flows from the Constitution alone . . . and . . . cannot be modified, abridged, or diminished by the Congress." *Id.*, at 266. See also *Ex parte Garland*, 4 Wall. 333, 380 (1867).

*INS* v. *Chadha*, 462 U. S. 919 (1983), is another example of the Court's refusal to apply a balancing test to assess the validity of an enactment which interferes with a power that the Constitution, in express terms, vests within the exclusive control of the President. In *Chadha*, the Court struck down a legislative veto provision in the Immigration and Nationality Act on the ground, *inter alia*, that it violated the explicit constitutional requirement that all legislation be presented to the President for his signature before becoming law. *Id.*, at 946–948, 957–959. In so holding, the Court did not ask whether the "overriding need to promote objectives within the constitutional authority of Congress" justified this intrusion upon the Executive's prerogative, but rather stated that the lawmaking process must adhere in strict fashion to the "[e]xplicit and unambiguous provisions of the Constitution [which] prescribe and define the respective functions of the Congress and of the Executive in the legislative process." *Id.*, at 945.[5]

The justification for our refusal to apply a balancing test in these cases, though not always made explicit, is clear enough. Where a power has been committed to a particular Branch of the Government in the text of the Constitution, the balance already has been struck by the Constitution itself. It is improper for this Court to arrogate to itself the power to adjust a balance settled by the explicit terms of the Constitution. To take an obvious example, it would be improper for us to hold that, although the Constitution sets 35 as the age below which one cannot be President, age 30 would in fact be a permissible construction of this term. See U. S. Const., Art. II, § 1. And it would be equally improper for us to determine that the level of importance at which a jury trial in a

---

[5] Our decision in *Chadha* might also be read for the more general principle that where an enactment transgresses the explicit distribution of power in the text of the Constitution, then regardless of whether it implicates the Legislative, the Judicial, or the Executive power, a balancing inquiry is not appropriate. I need not address the broader principle in this case.

common-law suit becomes available is $1,000 instead of $20, as the Constitution provides. See U. S. Const., Amdt. 7. These minor adjustments might be seen as desirable attempts to modernize the original constitutional provisions, but where the Constitution draws a clear line, we may not engage in such tinkering.

However improper would be these slight adjustments to the explicit and unambiguous balances that are struck in various provisions of the Constitution, all the more improper would it be for this Court, which is, after all, one of the three coequal Branches of the Federal Government, to rewrite the particular balance of power that the Constitution specifies among the Executive, Legislative, and Judicial Departments. This is not to say that each of the three Branches must be entirely separate and distinct, for that is not the governmental structure of checks and balances established by the Framers. See *Mistretta* v. *United States*, 488 U. S. 361, 380–381 (1989); *Humphrey's Executor* v. *United States*, 295 U. S. 602, 629 (1935). But as to the particular divisions of power that the Constitution does in fact draw, we are without authority to alter them, and indeed we are empowered to act in particular cases to prevent any other Branch from undertaking to alter them.

These considerations are decisive of the suit before us. The President's power to nominate principal officers falls within the line of cases in which a balancing approach is inapplicable. The Appointments Clause sets out the respective powers of the Executive and Legislative Branches with admirable clarity. The President has the sole responsibility for nominating these officials, and the Senate has the sole responsibility of consenting to the President's choice. See *supra*, at 483. We have, in effect, already recognized as much in *Buckley* v. *Valeo*, 424 U. S. 1 (1976). In *Buckley*, the Court held that the appointment of Federal Election Commissioners through procedures that were inconsistent with those set forth in the Appointments Clause was uncon-

stitutional. In doing so, it rejected outright the arguments advanced by the Federal Election Commission and various *amici* that because the Constitution gave Congress "explicit and plenary authority to regulate [the] field of activity" at issue (federal elections), and because Congress "had good reason[s] for not [creating] a commission composed wholly of Presidential appointees," that Congress could allow these officials to be appointed to their positions without complying with the strict letter of the Appointments Clause. As we stated there:

> "While one cannot dispute the basis for [Congress' concern that an election commission exist not in whole of presidential appointees] as a practical matter, it would seem that those who sought to challenge incumbent Congressmen might have equally good reason to fear a Commission which was unduly responsive to members of Congress whom they were seeking to unseat. *But such fears, however rational, do not by themselves warrant a distortion of the Framers' work." Id.,* at 134 (emphasis added).

It is also plain that the application of FACA would constitute a direct and real interference with the President's exclusive responsibility to nominate federal judges. The District Court found, "at minimum, that the application of FACA to the ABA Committee would potentially inhibit the President's freedom to investigate, to be informed, to evaluate, and to consult during the nomination process," and that these consequences create an "obvious and significant potential for 'disruption' of the President's constitutional prerogative during the nomination process," 691 F. Supp. 483, 493 (DC 1988), and these findings are not contested here. As we said in the context of the pardon power, "[t]he simplest statement is the best." *United States* v. *Klein,* 13 Wall., at 148. The mere fact that FACA would regulate so as to interfere with the manner in which the President obtains information necessary to discharge his duty assigned under the Constitution to

nominate federal judges is enough to invalidate the Act. "We think it unnecessary to enlarge." *Ibid.*

For these reasons, I concur in the judgment affirming the District Court.