# Common Legislative Encroachments
# On Executive Branch Authority

This memorandum lists and briefly discusses a variety of common provisions of legislation that are offensive to principles of separation of powers, and to executive power in particular, from the standpoint of policy or constitutional law.

July 27, 1989

MEMORANDUM OPINION FOR THE GENERAL COUNSELS' CONSULTATIVE GROUP*

This memorandum provides an overview of the ways Congress most often intrudes or attempts to intrude into the functions and responsibilities assigned by the Constitution to the executive branch. It highlights ten types of legislative provisions commonly included in proposed legislation that weaken the Presidency. It is important that all of us be familiar with each of these forms of encroachment on the executive's constitutional authority. Only by consistently and forcefully resisting such congressional incursions can executive branch prerogatives be preserved. Of course, the methods of intruding on executive power are limited only by Congress's imagination; thus, our ten examples are illustrative rather than exhaustive. This Office is always pleased to assist in reviewing legislation for any possible encroachments on the President's authority.

## 1. Interference with the President's Appointment Power

The Appointments Clause is an essential aspect of separation of powers. By permitting the President or his direct subordinates to appoint the officials within the executive branch, the Appointments Clause helps ensure that those who make policy are accountable to the President.

### a. The Appointments, Incompatibility and Ineligibility Clauses

The Appointments Clause of the Constitution, Article II, Section 2, Clause 2, provides that "Officers of the United States" must be appointed by the President with the advice and consent of the Senate, or, where

---

*Editors Note: This memorandum has been superseded *See* Memorandum for the General Counsels of the Federal Government from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re· The Constitutional Separation of Powers between the President and Congress* 1 n.1 (May 7, 1996) (to be published).

authorized by Congress, by the President alone, the courts, or the Heads of Departments. These methods of appointment are exclusive; officers of the United States therefore cannot be appointed by Congress, or by congressional officers. *Buckley v. Valeo*, 424 U.S. 1, 126, 141 (1976) (per curiam). Moreover, the scope of the term "officer" is broad: anyone who "exercis[es] significant authority pursuant to the laws of the United States" or who performs "a significant governmental duty ... pursuant to" the laws of the United States is an officer of the United States, *Buckley v. Valeo*, 424 U.S. at 126, 141, and therefore must be appointed pursuant to the Appointments Clause.

Notwithstanding the requirements of the Appointments Clause, Congress frequently establishes and directs commissions, agencies, boards, and other entities to perform operational responsibilities, and requires appointment of their members in a manner incompatible with the Appointments Clause. President Reagan repeatedly had to stress, in signing bills into law, that such commissions may perform only advisory, investigative, informative, or ceremonial functions and may not perform regulatory, enforcement, or other executive responsibilities.[1]

Similar problems have frequently arisen in connection with commemorative commissions, where the violation of the Appointments Clause frequently has been compounded by making Members of the Senate or House members of those commissions, in violation of the Incompatibility Clause of the Constitution, Article I, Section 6, Clause 2. Pursuant to that Clause, no person holding any office of the United States may be a Member of either House of Congress.[2] Members of Congress may constitutionally participate on such commissions only in an advisory or ceremonial capacity.[3] Where the members of a commission appointed in violation of the Appointments or Incompatibility Clauses constitute a majority of the Commission, the Commission itself may perform only advisory or ceremonial functions.[4] Any proposal to establish a new Commission should be reviewed carefully to determine if its duties include executive functions. If they do, the members of the Commission must be appointed pursuant to the Appointments Clause.

---

[1] An example of such a signing statement relates to the United States Commission on Civil Rights Act of November 30, 1983, 19 Weekly Comp Pres Doc. 1626, 1627 (1983).

[2] The appointment of Members of the Senate or the House to newly created positions also violates the Ineligibility Clause, that part of Article I, Section 6, Clause 2, pursuant to which "[n]o Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been increased during such time."

[3] *See, e g.*, signing statement dated September 29, 1983, relating to the establishment of the Commission on the Bicentennial of the United States Constitution, 19 Weekly Comp. Pres Doc. 1362 (1983).

[4] *See, e g ,* signing statement dated August 27, 1984, relating to the establishment of a Commission on the Commemoration of the First Legal Holiday Celebrating the Birth of Martin Luther King, Jr., 20 Weekly Comp Pres. Doc 1192 (1984).

### b. Other Inroads on the President's Appointment Power

Congress also frequently imposes such significant limitations on whom the President may appoint that Congress effectively makes the appointment itself. For example, Congress often legislatively directs the President to nominate an official from among individuals named in lists submitted by the Speaker of the House and the President Pro Tempore of the Senate or other officers of Congress. Such requirements are an unconstitutional attempt to share in the appointment authority which is textually committed to the President alone. The requirement that the President (or other executive officials) appoint persons who will exercise significant authority under the laws of the United States from lists submitted by State Governors or other persons not appointed in accordance with the Appointments Clause suffers from the same constitutional defect.[5]

Congress also imposes impermissible qualifications requirements on principal officers. For instance, Congress will require that a fixed number of members of certain commissions be from a particular political party. These requirements also violate the Appointments Clause. The only congressional check that the Constitution places on the President's power to appoint "principal officers" is the advice and consent of the Senate. As Justice Kennedy recently wrote for himself and two other members of the Court:

> By its terms, the [Appointments] Clause divides the appointment power into two separate spheres: the President's power to 'nominate,' and the Senate's power to give or withhold its 'Advice and Consent.' No role whatsoever is given either to the Senate or to Congress as a whole in the process of choosing the person who will be nominated for [the] appointment.

*Public Citizen v. Department of Justice*, 491 U.S. 440, 483 (1989) (Kennedy, J., concurring).

### c. Delegation of Federal Executive Power

One of the gravest new threats to executive branch power is Congress's growing penchant for assigning the executive power to persons who are not part of the executive branch. We believe the assignment of such powers poses a substantial threat to the executive branch, regardless whether the power is assigned to members of the legislative branch, state officials, or private citizens. The assignment of such powers away from the executive branch necessarily weakens the executive branch in relation to the

---

[5] In fact, a person who is given the authority to draft such lists from which an appointment must be made would be exercising significant authority for purposes of the Appointments Clause.

legislative and judicial branches, and it raises substantial Appointments Clause and other separation of powers questions.

One current example of Congress assigning executive branch power can be found in the so-called "qui tam" provisions, such as those found in the False Claims Act, 31 U.S.C. §§ 3729-3733. In these qui tam provisions, Congress authorizes *any* person to prosecute — on behalf of the United States and in the name of the United States — a civil fraud action for treble damages and penalties against any person who allegedly makes a false claim to the United States Government. The qui tam plaintiff is empowered to sue on the Government's behalf even if he has sustained no personal injury. As a bounty for prosecuting the fraud, the qui tam plaintiff receives up to thirty percent of any damages and penalties recovered, with the balance paid into the United States Treasury.

We believe such provisions must be vigorously resisted. The power to litigate the claims of the United States is committed by the Constitution to the executive branch. It is well established that "conducting civil litigation in the courts of the United States for vindicating public rights" is at the core of Executive power and "may be discharged *only* by persons who are 'Officers of the United States'." *Buckley*, 424 U.S. at 140 (emphasis added); *see also United States v. San Jacinto Tin Co.*, 125 U.S. 273, 279 (1888) (the Attorney General "is undoubtedly the officer who has charge of the institution and conduct of the pleas of the United States, and of the litigation which is necessary to establish the rights of the government"); *Confiscation Cases*, 74 U.S. (7 Wall.) 454, 458-59 (1868) ("[S]o far as the interests of the United States are concerned, [all suits] are subject to the direction, and within the control of, the Attorney General.").

## 2. Hybrid Commissions

Congress often creates commissions composed of members or appointees of the legislative and executive branches. These commissions are not clearly a part of either branch. As noted above, if the Commission is to exercise significant authority, the Constitution requires that its members be appointed pursuant to the Appointments Clause. Even if its functions are merely advisory, however, we believe that the establishment of such hybrid commissions is inconsistent with the tripartite system of government established by the framers of our Constitution. Thus, the Department of Justice has frequently included in its bill comments the following:

> The creation of a Commission that is not clearly legislative, judicial, or executive, tends to erode the structural separation of powers. As established by this bill, the Commission could not be considered to be a part of any of the three Branches and would be in the difficult position of having to

serve two masters. Although the Branches of Government are not "hermetically sealed" from one another, (*Immigration and Naturalization Service v. Chadha*, 462 U.S. 921 (1983)), the separation of powers suggests that each branch maintain its separate identity, and that functions be clearly assigned among the separate branches. The Commission does not mesh with this constitutional structure.

In many instances, the problems created by a hybrid commission are aggravated by the fact that the commission's membership is to contain more representatives of the legislative branch than of the executive branch. In such cases, the Department has to the imbalance, made an additional objection in our bill comments to the following effect:

> In any event, the representation on the Commission of the Executive and Legislative Branches lacks the proper balance. According to the bill, the Commission would comprise one member of the Executive branch, twelve Members of Congress, and five members from the private sector. In our view, the proper relationship between the two co-equal Branches would require that they be equally represented on a Commission of this type in terms of numbers as well as rank.

### 3. Attempts to Constrain the Removal Power

The President, as the head of a unitary executive branch, has a duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, to coordinate and supervise his subordinates, and to ensure that the executive branch speaks with one voice. *See generally Myers v. United States*, 272 U.S. 52, 163-64 (1926). The President's power to remove subordinates is essential to carrying out these responsibilities. The constitutional limitations on congressional restrictions on the President's removal authority "ensure that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Morrison v. Olson*, 487 U.S. 654, 690-91 (1988).

A recent example of Congress considering a bill that would severely undermine the President's ability to faithfully execute the laws is the proposal to make the Social Security Administration an independent agency by limiting the President's removal powers with respect to its officers. There are literally hundreds of other examples and variations on the theme of restrictions on the President's removal power. Because the power to remove is the power to control, restrictions on removal power strike at the heart of the President's power to direct the executive branch and perform his constitutional duties. In particular, the inability to

remove officers erodes significantly the President's responsibility to "take Care that the Laws be faithfully executed."

We recognize that the Court upheld restrictions on the executive branch's authority to remove an Independent Counsel in *Morrison v. Olson*. The Court stated that the constitutionality of a "for cause" removal provision turns on whether the removal restrictions "impede the President's ability to perform his constitutional duty" and that the functions of the officer whose removal is limited must be analyzed in that light. *Id.* at 691. The Court relied upon three primary points in upholding the "for cause" removal restrictions on the Independent Counsel. The Court reasoned that the "for cause" removal provision was constitutional because the Independent Counsel: (1) is an inferior officer under the Appointments Clause; (2) enjoys only limited jurisdiction and tenure; and (3) lacks policy making or significant administrative authority.

A comparison of the status and functions of the independent counsel, and the status and functions of the officers proposed to be subject to removal restrictions will often show the proposed restriction to be distinguishable from *Morrison*. Moreover, the Independent Counsel was performing a function — the prosecution of high level government officials — where there was perceived to be a conflict of interest within the executive branch. Whether distinguishable or not, the power of the executive branch will be best preserved by vigorous opposition to such restrictions.

### 4. Micromanagement of the Executive Branch

There has recently been an unabashed willingness by Congress to micromanage foreign affairs and executive branch internal deliberations. For example, S.J. Res. 113, concerning the FSX aircraft, contained detailed provisions intruding into internal executive branch deliberations, including specific directives to a particular executive agency to solicit and consider comments or recommendations from another agency and to make certain recommendations to the President. It also required that the President consider these recommendations. Such provisions clearly constitute an inappropriate intrusion by Congress into executive branch management and an encroachment on the President's authority with respect to deliberations incident to the exercise of executive power. Similarly, bills that require a particular executive agency to be excluded from a policy or executive decision unconstitutionally infringe upon the unitary executive and must, therefore, be resisted. Finally, bills that prohibit executive agencies from taking actions to reorganize or consolidate offices within their agencies or that prohibit agencies from expending funds on activities that are clearly part of the agency's mission constitute an indefensible interference with the day-to-day management of the executive departments.

While Congress has a free hand in determining what laws the President is to enforce, we do not believe that Congress is constitutionally entitled

253

to dictate *how* the executive branch is to execute the law. Congress' recent interest in determining the precise organizational structure of executive branch departments and the chain of command with respect to internal deliberations seriously threatens the executive branch's ability to effectively and efficiently fulfill its obligations. If continued, this pattern would result in the executive branch being substantially controlled and administered by the legislative branch.

## 5. Attempts to Gain Access to Sensitive Executive Branch Information

Congress consistently attempts to obtain access to the most sensitive executive branch information and is not always receptive to arguments that the executive branch, like Congress and the courts, must enjoy some measure of protection for confidential exchanges of information if it is to function effectively. Last month, this Office provided you with a memorandum that focused on executive privilege. In addition to overt efforts to obtain privileged information, Congress often includes in bills language that purports to require that "all information" or "all reports" regarding a specific subject be made available to a particular congressional committee or other entity that is not part of the executive branch. Such efforts should be resisted, however, as an unconstitutional encroachment on the President's constitutional responsibility to protect certain information. Therefore, it should always be recommended that such provisions include the phrase "to the extent permitted by law." A typical statement of this Department's position regarding a requirement to make available any or all information and reports is as follows:

> The Department objects to the breadth of this amendment and its failure to recognize the President's constitutional right and duty to withhold from disclosure certain information. The President must retain the authority to withhold in the public interest information whose disclosure might significantly impair the conduct of foreign relations, the national security, the deliberative processes of the executive branch or the performance of its constitutional duties. Accordingly, the Department recommends that the committees' right to obtain such information be qualified by the phrase "to the extent permitted by law."

## 6. Concurrent Reporting Requirements

In the past year, Congress has increased significantly its use of concurrent reporting requirements in an effort to insert itself into the executive branch decisionmaking process. A concurrent reporting requirement requires an agency simultaneously to transmit to Congress a budget rec-

ommendation or legislative proposal that it transmits to OMB or the White House.

In some instances, a concurrent reporting requirement has even been applied within a department. For example, in 1982 Congress attempted to require the Federal Aviation Administration Administrator to transmit to Congress any budget recommendations or legislative proposals that were transmitted by the Administrator to the Secretary of Transportation. We advised that this provision was unconstitutional.[6]

Concurrent reporting requirements may breach the separation of powers by disrupting the chain of command within the executive branch and preventing the President from exercising his constitutionally guaranteed right of supervision and control over executive branch officials. Moreover, such provisions infringe upon the President's authority as head of a unitary executive to control the presentation of the executive branch's views to Congress. Accordingly, such concurrent reporting requirements should be opposed. However, if enacted, the requirement to transmit reports to Congress should be construed as applying only to "final" recommendations that have been reviewed and approved by the appropriate superiors within the executive branch, including OMB, and if necessary, the President.

## 7. Legislative Vetoes

In *INS v. Chadha*, 462 U.S. 919 (1983), the Supreme Court held that Congress may only exercise legislative power by passing a bill and presenting it to the President. Thus, the Court held unconstitutional a statutory provision that allowed one House to veto and overrule a decision made by the Attorney General with respect to a deportation. Congress must abide by a delegation of authority to an executive branch official, such as whom to deport, until that delegation is legislatively altered or revoked. Attempts to make particular executive branch decisions contingent upon congressional action or to take binding actions without compliance with the constitutional requirement of presentment are unconstitutional. Efforts to "veto" executive action without complying with the presentment requirement are known as "legislative vetoes." Despite the presentment requirement, Congress has continued to include some forms of legislative veto devices in legislation. *Chadha*, however, clearly stands for the proposition that Congress can only affect the obligations and duties of others through the legislative process and that bills requiring an executive official to take, or not to take, a particular action must be presented to the President. Any leg-

---

[6] Memorandum for John Fowler, General Counsel, Department of Transportation, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re Statutory Requirements for the FAA Administration to Provide Certain Budget Information and Legislative Recommendations Directly to Congress* (Nov. 5, 1982)

islation that subjects executive action to veto or approval by the Houses of Congress or their committees is unconstitutional.

## 8. Requirements that Legislation be Submitted to Congress

Under Article II, Section 3 of the Constitution, the President is directed to recommend for legislative consideration "such Measures as he shall judge necessary and expedient." Despite this Clause, Congress frequently attempts by statute to control the executive's legislative priorities by requiring that the President or his subordinates recommend legislative measures on certain subjects. Because the President has plenary exclusive authority to determine whether and when he should propose legislation, any bill purporting to require the submission of recommendations is unconstitutional. If enacted, such "requirements" should be construed as only a recommendation to the President that he submit legislative proposals.

## 9. Attempts to Restrict the President's Foreign Affairs Powers

Since the 1970s, Congress has increasingly attempted to assert itself in the area of foreign affairs at the expense of the authority traditionally exercised by the President.[7] The President has the responsibility, under the Constitution, to determine the form and manner in which the United States will maintain relations with foreign nations. *E.g.*, U.S. Const. art. II, §§ 1-3; *Haig v. Agee*, 453 U.S. 280, 291-92 (1981); *Baker v. Carr*, 369 U.S. 186, 212-13 (1962); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319-20 (1936). It has long been recognized that the President, both personally and through his subordinates in the executive branch, determines and articulates the Nation's foreign policy. *See* Statement of John Marshall, 10 Annals of Cong. 613 (1800); *Curtiss-Wright*, 299 U.S. at 320 ("the President [is] the sole organ of the federal government in the field of international relations — a power which does not require as a basis for its exercise an act of Congress"). This authority encompasses the authority to make treaties on such terms as the

---

[7] The history of recent congressional action in this area was succinctly summarized in the following excerpt from an article by Senator John G. Tower, Chairman of the Senate Armed Services Committee.

> The 1970's were marked by a rash of Congressionally initiated foreign policy legislation that limited the President's range of options on a number of foreign policy issues. The thrust of the legislation was to restrict the President's ability to dispatch troops abroad in a crisis, and to proscribe his authority in arms sales, trade, human rights, foreign assistance and intelligence operations. During this period, over 150 separate prohibitions and restrictions were enacted on Executive Branch authority to formulate and implement foreign policy. Not only was much of this legislation ill conceived, if not actually unconstitutional, it has served in a number of instances to be detrimental to the national security and foreign policy interests of the United States.

John G. Tower, *Congress Versus the President· The Formulation and Implementation of American Foreign Policy*, 60 Foreign Aff., 229, 234 (Winter, 1981-1982)

President deems advisable and to discuss any issue with another sovereign nation and to recommend to it such courses of action as the President believes are in our Nation's interest.

Accordingly, provisions that would prohibit officers or employees of the United States government from soliciting funds or material assistance from foreign governments (including any instrumentality or agency thereof), foreign persons, or United States persons, for the purpose of furthering any military, foreign policy, or intelligence activity are unconstitutional. Similarly, any provision that purports to prohibit, or to require, consultation between the United States and another sovereign nation would be unconstitutional. No limitations on the President's authority to discuss certain issues with foreign governments, or to recommend or concur in courses of action taken by other nations, should be sanctioned.

*10. Restrictions on the President's Power to Make Recess Appointments*

In addition to frequent attempts to place restrictions on the power of the President to appoint officers of the United States under the Appointments Clause, Congress has occasionally attempted to constrain his power under Article II, Section 2, Clause 3 to "fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." Thus, for example, a provision in an appropriations bill several years ago purported to mandate continued funding for grantees of the Legal Services Corporation unless action was taken by directors confirmed by the Senate. This provision interfered with the President's recess appointment power to the extent that it purported to disable recess appointees from performing functions that could be performed by directors confirmed by the Senate. This trend is dangerous for presidential powers because the recess appointment power is an important counterbalance to the power of the Senate. By refusing to confirm appointees, the Senate can cripple the President's ability to enforce the law. The recess appointment power is an important resource for the President, therefore, and must be preserved.

WILLIAM P. BARR
*Assistant Attorney General*
*Office of Legal Counsel*