MARKMAN, J.
(dissenting). The issue in this case concerns the Legislature’s mandated separation of the government from politics in order to maintain governmental neutrality in elections, preserve fair democratic processes, and prevent taxpayer funds from being used to subsidize partisan political activities. The Michigan Campaign Finance Act (MCFA) prohibits a “public body” from using public resources to make any “contribution or expenditure” for political purposes. MCL 169.257(1). The majority concludes that a school district’s administration of a payroll deduction plan that remits funds to the Michigan Education Association’s Political Action Committee (MEA-PAC) “is not precluded by any prohibition in MCL 169.257(1) and is therefore permitted.” Ante at 21.1 respectfully dissent, and believe that a school district’s administration of a *41 payroll deduction plan that remits funds to a partisan political action committee (a) constitutes a “contribution” because public resources are being used to advance the political objectives of the committee and (b) constitutes an “expenditure” because public “services” and “facilities in assistance of” these same political objectives are being provided. Thus, the school district’s payroll deduction plan is prohibited by § 57 of the MCFA, MCL 169.257. This interpretation is consistent not only with the language of the statute, but also with the evident purpose of § 57, which is to mandate the separation of the government from politics in order to maintain governmental neutrality in elections, preserve fair democratic processes, and prevent taxpayer funds from being used to subsidize partisan political activities. Accordingly, I would affirm the judgment of the Court of Appeals.
I. FACTS AND HISTORY
Petitioner, the Michigan Education Association (MEA), is a voluntary, incorporated labor organization that represents approximately 136,000 members employed by public schools, colleges, and universities throughout Michigan. The MEA-PAC is a separate segregated political fund established by the MEA in accordance with § 55 of MCFA, MCL 169.255. The MEA-PAC is significantly funded by payroll deductions of MEA members who have authorized the deductions. The purpose of the MEA-PAC is to facilitate and coordinate the involvement of the MEA in politics, by electing candidates favored by the MEA and by furthering the enactment of MEA legislative and executive policy initiatives.
As a public-employee labor organization, the MEA has entered into collective bargaining agreements with *42 various public school districts across the state. Some number of these agreements, including that between the MEA’s locally affiliated Kalamazoo County/Gull Lake Education Associations and the Gull Lake Community Schools (the school district), require that a school district administer a payroll deduction plan for the contributions of MEA members to the MEA-PAC. In return, the MEA pays the school district the costs of the plan’s administration.
On August 22, 2006, the MEA filed a request for a declaratory ruling with respondent, the Secretary of State, to determine whether the school district could continue to make and transmit payroll deductions to the MEA-PAC.[1] Respondent ruled that, absent express statutory authority, the school district is prohibited from expending public resources for a payroll deduction plan on behalf of the MEA-PAC. The MEA appealed to the circuit court, which held that respondent’s ruling was “arbitrary, capricious and an abuse of discretion,” reasoning that, although the school district’s administration of the plan constitutes an “expenditure” under MCFA, when the costs of administering the plan have been reimbursed, “no transfer of money to the MEA-PAC has occurred, and therefore an ‘expenditure’ has not been made within the meaning of the MCFA.”
In a split decision, the Court of Appeals reversed, holding that § 57 of MCFA prohibits a “public body,” such as a school district, from using public resources “to make a contribution or expenditure.” According to the Court, the costs associated with the plan constitute an “expenditure,” and the reimbursement of such costs does not alter that conclusion. Mich Ed Ass’n v Secre *43 tary of State, 280 Mich App 477, 486; 761 NW2d 234 (2008). The MEA then sought leave to appeal in this Court. On November 5, 2009, we heard oral arguments on the application, and nearly seven months later we granted the MEA’s application for leave to appeal.[2]
II. STANDARD OF REVIEW
The interpretation of statutes constitutes a question of law that this Court reviews de novo on appeal. Eggleston v Bio-Med Applications of Detroit, Inc, 468 Mich 29, 32; 658 NW2d 139 (2003).
III. PURPOSE OF § 57
“It is well settled that the Legislature of this state is empowered to enact laws to promote and regulate political campaigns and candidacies.” Council No 11, AFSCME v Civil Serv Comm, 408 Mich 385, 395; 292 NW2d 442 (1980) (citations omitted). The people of Michigan have granted the Legislature broad powers to regulate elections. Among other things, our Constitution empowers the Legislature to set forth the qualifications of electors; the time, place, and manner of elections; and limitations on terms of office. Const 1963, art 2, §§ 1 through 10. Furthermore, Const 1963, art 2, § 4 requires the Legislature to preserve the integrity of elections, providing in pertinent part:
The legislature shall enact laws to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting.
Charged to preserve the “purity of elections” and to “guard against abuses of the elective franchise,” the *44 Legislature enacted MCL 169.257, commonly referred to as § 57 of MCFA. Section 57 prohibits a “public body” from using public resources to “make a contribution or expenditure” for the purpose of influencing the nomination or election of a candidate, or for the qualification, passage, or defeat of a ballot question. The clear purpose of § 57, as reflected in its language, is to mandate the separation of the government from politics in order to maintain governmental neutrality in elections, preserve fair democratic processes, and prevent taxpayer funds from being used to subsidize partisan political activities.[3]
IV ANALYSIS
MCL 169.257(1) provides, in pertinent part:
A public body or an individual acting for a public body shall not use or authorize the use of funds, personnel, office space, computer hardware or software, property, stationery, postage, vehicles, equipment, supplies, or other public resources to make a contribution or expenditure or provide volunteer personal services that are excluded from the definition of contribution under [MCL 169.204(3)(a)].
There is no question that a school district constitutes a “public body” within the meaning of § 57.[4] Accord *45 ingly, the issue in this case is whether a school district’s administration of a payroll deduction plan that remits funds to a political action committee constitutes a “contribution or expenditure” within the meaning of the same provision. If the plan does, it is expressly prohibited.
A. “CONTRIBUTION”
MCL 169.204(1) defines a “contribution” as follows:
“Contribution” means a payment, gift, subscription, assessment, expenditure, contract, payment for services, dues, advance, forbearance, loan, or donation of money or anything of ascertainable monetary value, or a transfer of anything of ascertainable monetary value to a person, made for the purpose of influencing the nomination or election of a candidate, or for the qualification, passage, or defeat of a ballot question.[5]
An “in-kind contribution” is defined as a “contribution . . . other than money.” MCL 169.209(3).
The school district’s administration of the payroll deduction plan that facilitates payments to the MEA-PAC constitutes a prohibited “contribution.” First, the school district uses a variety of public resources to administer the plan. For example, the school district must use its paper, pens, and copiers to develop and execute payroll deduction authorization forms; school personnel must collect, enter, and monitor the data of participating MEA members into computers and accounting software, all of which must be specifically configured to record, track, and transmit payroll deduc *46 tions to the MEA-PAC; school personnel must then be prepared to respond to individual teachers who find it necessary from time to time to adjust or correct or withdraw their own deduction authorizations; and this process must necessarily involve the use of public office space, equipment, and employee time.
Second, the school district’s administration of the payroll deduction plan constitutes something of “ascertainable monetary value” because there is inherent value to the MEA-PAC in having payroll deductions automatically taken from members’ wages as opposed to requiring individual solicitations by the MEA-PAC. That there is such “ascertainable monetary value” is self-evident from the very fact that the MEA-PAC has affirmatively sought out the assistance of the school district and has litigated to the highest court of this state an appeal asserting its right to enter into the instant agreement with the school district. Parties do not typically enter into contracts absent a belief that the rights or benefits accorded them under the contract have some “ascertainable monetary value,” and the instant contract seems no different. Such value can almost certainly be identified as the sum of (a) the additional contributions resulting from the ease of the payroll deduction process compared to a political contribution process in which individual solicitations must be undertaken and (b) the reduced administrative and transactional costs of the former process compared to the latter process. The MEA obviously prefers the payroll deduction process because it is a more efficient, and a more productive, process by which to secure funding for its political activities. The school district is not incidental to this process, but constitutes an indispensable element. Without the school district’s contracted-for services, some lesser amount of contri *47 butions would presumably be raised on behalf of the MEA-PAC, and at a greater cost.
Third, the services undertaken on behalf of the MEA-PAC are “made for the purpose of influencing the nomination or election of a candidate, or for the qualification, passage, or defeat of a ballot question,” MCL 169.204(1), because, as discussed earlier, the purpose of the MEA-PAC is to facilitate and coordinate the involvement of the MEA in partisan politics.[6] Thus, the school district’s administration of the deduction plan constitutes a “contribution,” as that term is defined by MCL 169.204(1).[7] Because the school district employs public *48 resources to make this “contribution,” its administration of the deduction plan is a straightforward violation of §57 ofMCFA.
Moreover, the administration of the payroll deduction plan also constitutes an “in-kind contribution,” defined by MCL 169.209(3), as a “contribution . . . other than money.”[8] Although it is clearly possible to quantify the time spent by employees and the resources expended by the school district in administering the deduction plan, and thereby to ascertain the cost of such a “contribution” to the school district itself, it is considerably more difficult to quantify the intangible benefits that the MEA receives from the deduction plan. Moreover, it is quite certain that these benefits substantially outweigh the costs to the school district, and therefore cannot be calculated simply by reference to the school district’s costs. The most significant of these is simply the extent of access to a district’s MEA membership that is afforded to the MEA-PAC by the deduction plan. Such access avoids any need on the part of the MEA-PAC to establish its own administrative apparatus for political fundraising, vitiates its need to engage in costly mailings and alternative forms of communications with its members, and dispenses with its burden of having to process checks, money orders, or credit cards from contributors, as would have been *49 necessary for any other solicitor of political contributions. As MEA’s counsel at oral argument acknowledged, this method has proved an “effective” means to raise money. Almost certainly, the marginal administrative costs of the payroll deduction plan to the school district, which already may have in place a mechanism by which taxes and charitable contributions can be deducted from employees’ paychecks, will be less than the marginal administrative costs of an equivalent plan to the MEA, which does not have a similar mechanism in place. The difference between these respective administrative costs can fairly be described as an “in-kind contribution” by the school district to the MEA-PAC, however difficult it may be to quantify in dollars. It is a “contribution.. . other than money” that is made for the “purpose of influencing the nomination or election of a candidate, or for the qualification, passage, or defeat of a ballot question.”
B. “EXPENDITURE”
Section 57 of MCFA also prohibits a “public body” from using public resources to make an “expenditure.” An “expenditure” is defined as
a payment, donation, loan, or promise of payment of money or anything of ascertainable monetary value for goods, materials, services, or facilities in assistance of, or in opposition to, the nomination or election of a candidate, or the qualification, passage, or defeat of a ballot question. [MCL 169.206(1).]
The school district’s administration of the payroll deduction plan on behalf of the MEA-PAC constitutes a prohibited “expenditure” because the school district directly provides “services” and “facilities in assistance of” the MEA-PAC. The school district provides “services” to the MEA-PAC in its administration of the *50 deduction plan by developing and executing payroll deduction authorization forms; by collecting, entering, and monitoring the data of MEA members into computers and accounting software, all of which must be configured to record, track, and transmit payroll deductions to the MEA-PAC; and by accommodating individual teachers who find it necessary from time to time to adjust or correct or withdraw their deduction authorizations. Further, the school district provides “facilities in assistance of” the MEA-PAC through the use of public office space and equipment. These “services” and “facilities in assistance of” the MEA-PAC are, once again, made for the purpose of “the nomination or election of a candidate, or the qualification, passage, or defeat of a ballot question,” MCL 169.206(l)(a), because, as discussed previously, the purpose of the MEA-PAC is to facilitate and coordinate the involvement of the MEA in politics, by electing candidates favored by the MEA and by enacting MEA legislative and policy initiatives. Thus, the school district’s administration of the payroll deduction plan constitutes an “expenditure” as that term is defined by MCL 169.206(l)(a) and is specifically prohibited.
The majority concedes that the school district’s administration of the deduction plan “falls within the general definition of ‘expenditure’ under MCL 169.206(1) . . ..” Ante at 30. However, the majority holds that the plan also falls within a specific statutory exclusion from the definition of an “expenditure.” See ante at 30. This exception provides that an “expenditure” does not include “[a]n expenditure for the establishment, administration, or solicitation of contributions to a separate segregated fund or independent committee.” MCL 169.206(2)(c). According to the majority, a school district’s administration of a payroll deduction plan that remits payments to a political *51 action committee constitutes an “expenditure for the establishment, administration, or solicitation of contributions to a separate segregated fund or independent committee” and is, therefore, allowed under § 57. Ante at 32-33. However, the majority overlooks that a “’public body,” such as a school district, is not authorized to “establish” a separate segregated fund under MCFA and, therefore, may not rely on the § 6(2) (c) exclusion.
Instead, this exclusion is clearly designed to apply only to corporations and labor organizations that possess the authority to create, establish, administer, or fund separate segregated funds in the first place. This interpretation, limiting the § 6(2) (c) exclusion to corporations and labor organizations, is a necessary implication from the structure of MCFA for three reasons. First, § 54 of MCFA, MCL 169.254, imposes the same rule, prohibiting the making of a “contribution or expenditure,” on corporations and labor organizations that § 57 imposes on public bodies. In pertinent part, § 54 provides:
Except with respect to the exceptions and conditions in.. . section 55 [MCL 169.255]. .. a corporation, joint stock company, domestic dependent sovereign, or labor organization shall not make a contribution or expenditure .... [MCL 169.254(1) (emphasis added).]
Second, unlike § 57, § 54 does not constitute an absolute prohibition against making a “contribution or expenditure;” rather, pursuant to § 55,
[a] corporation organized on a for profit or nonprofit basis, a joint stock company, a domestic dependent sovereign, or a labor organization formed under the laws of this or another state or foreign country may make an expenditure for the establishment and administration and solicitation of contributions to a separate segregated fund to be used for political purposes. A separate segregated fund estab *52 lished under this section shall be limited to making contributions to, and expenditures on behalf of, candidate committees, ballot question committees, political party committees, political committees, and independent committees. [MCL 169.255(1).]
Third, there is no similar counterpart in § 57 that allows a “public body” to make “an expenditure for the establishment and administration and solicitation of contributions to a separate segregated fund ....” Thus, under § 55, the only entities allowed to establish a separate segregated fund are corporations, joint stock companies, domestic dependent sovereigns, or labor organizations, such as the MEA. Considered together, § 55 and the § 6(2) (c) exclusion that permits an “expenditure for the establishment, administration, or solicitation of contributions to a separate segregated fund” provide a limited mechanism allowing entities such as the MEA to create, establish, administer, or fund a separate segregated fund for purposes that would otherwise be disallowed by § 54. In contrast, a “public body,” such as a school district, is not entitled to create, establish, administer, or fund a separate segregated fund, under § 55 or any other provision, and thus may not rely on the § 6(2)(c) exclusion from the definition of an “expenditure.”
Even if, as the majority claims, the § 6(2)(c) exclusion is not limited to § 55 entities, the majority’s application of the exclusion remains utterly illogical. The majority concludes that although a school district’s administration of the payroll deduction plan constitutes an “expenditure,” it is nevertheless
explicitly excluded from the statutory definition under MCL 169.206(2)(c). .. [, which] excludes from the definition of “expenditure” any “expenditure for the establishment, administration, or solicitation of contributions to a separate segregated fund or independent committee.” A *53 public school’s administration of a payroll deduction falls squarely within the statutory exception. The system is set up to facilitate MEA member contributions to their separate segregated fund, the MEA-PAC. Therefore, the administration of the system is not an “expenditure” under the MCFA.
. .. Most importantly, the Secretary of State’s interpretation of “expenditure” is incorrect because it directly conflicts with the relevant statutory language. The Secretary of State’s interpretation of “expenditure” includes costs associated with collecting and delivering contributions to a committee. But... the statutory definition of “expenditure” explicitly excludes these costs.. .. The plain language of the statute dictates that the administration costs at issue are excluded from the statutory term “expenditure.” [Ante at 30-32 (emphasis omitted).]
The majority thus concludes that the administration of a payroll deduction plan falls “squarely within the statutory exception.” Under MCL 169.206(2)(c), an “expenditure” does not encompass what would otherwise be an “expenditure” for (a) establishment of a separate segregated fund or independent committee, (b) administration of a separate segregated fund or independent committee, or (c) solicitation of contributions to a separate segregated fund or independent committee. Thus, in order to fall within the purview of this exception, a “public body” must be engaged in one of these enumerated activities. In this case, however, the school district is engaged in none.
First, the school district is not making an “expenditure” for the establishment of a separate segregated fund or independent committee because the separate segregated fund, the MEA-PAC, has already been established by the MEA. In any event, the school district *54 could not establish a separate segregated fund in the first place, because that authority is limited to the entities enumerated in § 55 (corporations, joint stock companies, domestic dependent sovereigns, and labor organizations).
Second, the school district is not making an “expenditure” for the administration of a separate segregated fund or independent committee because the school district is not “administering” the MEA-PAC; rather, the school district is simply administering the payroll deduction plan that remits funds to the MEA-PAC. That is, the school district makes no determinations at all concerning amounts of funds to be raised from MEA members or other funding sources; the nature and substance of communications to MEA members and other funding sources about the need and urgency of such contributions; the identification of political candidates and causes as beneficiaries of the MEA-PAC, and in what amounts; or strategies for optimizing the impact of MEA-PAC participation in political campaigns and causes. The majority, however, holds that “[t]he plain language of the statute dictates that the administration costs at issue are excluded from the statutory term ‘expenditure.’ ” Ante at 32. In so asserting, the majority misinterprets the statute, because the only administrative costs that are excluded under this exclusion are those associated with administering a “separate segregated fund or independent committee.” MCL 169.206(2)(c). That the school district is administering a process by which payments are remitted to such a fund is hardly the equivalent of administering the fund itself, such that the § 6(2) (c) exclusion would apply. The majority is badly confused in this regard.
Third, the school district is not making an “expenditure” for the solicitation of contributions to a separate *55 segregated fund or independent committee; rather, the school district is using public resources for processing payments to the MEA-PAC. As discussed earlier, the school district’s “expenditure” consists of the use of personnel, office space, computers, software, and other public resources to remit payments to the MEA-PAC. The school district is not, for example, maintaining an advertising campaign on behalf of the MEA-PAC, cold-calling MEA members, or preparing mailers or brochures to enlist contributors. As such, the school district’s use of public resources for processing payments to the MEA-PAC cannot be viewed as soliciting contributions, but only as facilitating such contributions, an entirely distinct concept. It follows that because the school district’s administration of the payroll deduction plan does not fall within any of the three enumerated exclusions set forth in MCL 169.206(2)(c), it is not excluded from the definition of an “expenditure.”[9]
C. RELEVANCE OP ADVANCE PAYMENTS
Having determined that the school district’s administration of the payroll deduction plan that remits payments to the MEA-PAC constitutes both a “contribution” and an “expenditure,” the question remains whether the MEA’s preparedness to pay in advance the school district’s costs associated with the plan remedies what would otherwise constitute a violation of § 57.1 do not believe that it does.
*56 The Court of Appeals, in my judgment, correctly held that there is “nothing in the plain language of the MCFA that indicates reimbursement negates something that otherwise constitutes an expenditure.” Mich Ed Ass’n, 280 Mich App at 486. A court’s primary purpose in interpreting a statute is to ascertain and effectuate legislative intent. Frankenmuth Mut Ins Co v Marlette Homes, Inc, 456 Mich 511, 515; 573 NW2d 611 (1998). “Courts may not speculate regarding legislative intent beyond the words expressed in a statute. Hence, nothing may be read into a statute that is not within the manifest intent of the Legislature as derived from the act itself.” Omne Fin, Inc v Shacks, Inc, 460 Mich 305, 311; 596 NW2d 591 (1999) (citations omitted). The Legislature declined to provide that advance payments remedy what would otherwise constitute a violation of §57.
The suggestion that advance payments remedy a violation of § 57 is belied by the terms of the statute. Section 57 provides that “[a] public body. . . shall not use or authorize the use” of public resources to make a “contribution or expenditure .. . .” MCL 169.257(1) (emphasis added). The use of “shall” in a statute generally “indicates a mandatory and imperative directive.” Burton v Reed City Hosp Corp, 471 Mich 745, 752; 691 NW2d 424 (2005) (citations omitted). As such, the statute mandates that the school district not “use or authorize the use of” its public resources to make a “contribution” or an “expenditure.” Nothing in MCFA leads to the conclusion that the Legislature intended § 57 to be interpreted any differently. Irrespective of whether the school district is reimbursed for its administration of the payroll deduction plan, the school district nonetheless has employed public resources to make a “contribution or expenditure” for political pur *57 poses.[10] The advance payment of expenses simply does not negate what § 57 is intended to prohibit. That is, the gravamen of § 57 is not that a “public body,” whose resources have been employed for private political purposes be compensated on a dollar-for-dollar basis, but that public resources not be used for such purposes in the first place. That the costs of dismantling the wall separating government and partisan political campaigning are to be paid by those who desire to use taxpayer resources for their own campaigning is not the point of § 57; rather, it is that the wall not be dismantled.[11]
Furthermore, the unquantifiable cost to the school district, as well as to taxpayers, parents, and students, of having time and resources diverted from the school district’s primary responsibilities of administering schools and educating students in order to administer a process of raising political contributions for the MEA-PAC cannot simply be paid in advance or reimbursed. Time is a zero-sum resource, and it is irretrievably lost to taxpayers, parents, and students when it is taken away from the former responsibilities and redirected to the latter responsibilities. If some lesser portion of each *58 day is devoted to the interests of the school district and a greater portion of each day is devoted to the partisan political interests of a labor organization, taxpayers, parents, and students suffer. Although advance payment may recompense the school district its employees’ salaries for the time spent on administration of the plan and for the use of supplies and other public resources, monetary reimbursement, paid in advance or otherwise, is simply insufficient to recover the time that is diverted from the primary obligations of the school district.
Moreover, because neither advance payments nor reimbursements prevent the prohibited “use” of public resources from occurring in the first place, the act is punishable as a misdemeanor and subject to a fine that may be “equal to the amount of the improper contribution or expenditure.” MCL 169.257(2)(b). The fact that one of the penalties for making an improper “contribution or expenditure” requires the violator to pay an amount that is “equal to the amount of the improper contribution or expenditure” indicates strongly that such a payment, whether in the form of a “penalty” or a “reimbursement,” does not transform an improper “contribution or expenditure” into a proper one. Had the Legislature intended otherwise, the misdemeanor statute would more likely have read that the criminal sanction to be paid is “equal to the amount of the improper contribution or expenditure, less any reimbursement of such contribution or expenditure.”[12]
*59 V RESPONSE TO MAJORITY
As discussed previously, I believe that the majority errs by holding that a school district’s administration of the payroll deduction plan is excluded from the definition of an “expenditure” under MCL 169.206(2) (c) because a “public body,” such as a school district, is not authorized to create a separate segregated fund under MCFA and, therefore, may not rely on the § 6(2) (c) exclusion from the definition of an “expenditure.” Even if a “public body” is entitled to rely on this exclusion, the majority errs by holding that the school district’s administration of the payroll deduction plan falls “within the statutory exception” because the “expenditure” cannot be characterized as “[a]n expenditure for the establishment, administration, or solicitation of contributions to a separate segregated fund or independent committee.” As also discussed, I believe that the majority errs by holding that a school district’s admin *60 istration of the payroll deduction plan does not constitute a “contribution.” This latter aspect of the majority’s opinion warrants brief further discussion.
(a) In circular fashion, the majority holds that the definition of “contribution” encompasses the term “expenditure” and, thus, because the school district’s administration of the payroll deduction plan does not constitute an “expenditure,” it also cannot be a “contribution.” The majority then states that “[t]he only other way that the administration of the system could be a ‘contribution’ under the MCFA would be if administering the system resulted in a ‘transfer of anything of ascertainable monetary value ....’” Ante at 34. This assertion is erroneous. As discussed earlier, an “in-kind contribution,” which is a “contribution .. . other than money,” also constitutes a “contribution.” MCL 169.209(3). Similarly, MCFA defines as a “contribution” a “payment.” MCL 169.204(1). The school district arguably makes a “payment” to the MEA-PAC when it transfers money from participating MEA members to the MEA-PAC. Although in these circumstances the school district only acts as a conduit, a “contribution” made at the direction of another person “shall be regarded as an expenditure or contribution attributable to both persons . . ..” MCL 169.270.
(b) The majority further errs by concluding that its interpretation is necessary to avoid absurd results. In discussing whether the administration of the payroll deduction plan constitutes a “transfer of anything of ascertainable monetary value” and thus a “contribution,” the majority states:
There are two competing ways in which to interpret the word “transfer” in the statute. The first way to read the statute would require that any conveyance of value for services provided to a campaign, regardless of whether the *61 services are paid for, would constitute a contribution. The second way to read the statute would require a net conveyance of value in order to be a “transfer of anything of ascertainable monetary value.”
We conclude that the statute must be read to require a net conveyance of monetary value, as opposed to a mere exchange of value. Any other interpretation of “contribution” would lead to an absurd result, and statutes must be construed to prevent absurd results. For example, if the statute were to be interpreted in the manner the Secretary of State suggests, then a print shop that sells signage to a campaign in the normal course of business would be making a contribution to the campaign because it has transferred something of monetary value to the campaign, even though the shop has been compensated for the cost of providing the signage. Such an interpretation of “contribution” would defy common sense, and we do not read the statute in this manner. [Ante at 35-36 (citations omitted).]
By emphasizing that its interpretation is necessary to avoid “absurd results,” the majority itself appears to concede that the more natural interpretation of the law is that asserted by this dissent. Resort to “absurd results” analysis is generally necessary only to avoid an interpretation that would otherwise flow from a statute by the application of traditional principles of interpretation.
In essence, the majority believes that it is necessary to read MCL 169.204(1) as if it referred to a “net transfer of anything of ascertainable monetary value,” which it does not, in order to avoid the allegedly “absurd result” to which our interpretation of MCL 169.204(1) would lead. What is this allegedly “absurd result”? What is this result that is “quite impossible that [the Legislature] could have intended”? Pub Citizen v United States Dep’t of Justice, 491 US 440, 471; 109 S Ct 2558; 105 L Ed 2d 377 (1989) (Kennedy, J., concurring). What is this result that is “unthinkable” or *62 “bizarre”? Green v Bock Laundry Machine Co, 490 US 504, 527; 109 S Ct 1981; 104 L Ed 2d 557 (1989) (Scalia, J., concurring). What is this result that “cannot rationally . .. mean” what it seems to mean? Id. at 528.[13] That there be no exchanges of value between a “public body” and a partisan political action committee? That the government not further the partisan interests of a political action committee? That taxpayer resources not be employed to collect, and facilitate, partisan political contributions? While these results may be “absurd” to the majority justices, we do not find these to be “absurd” at all. Once again, the majority seems to equate an “absurd result” with a disagreeable result. Cameron v Auto Club Ins Ass’n, 476 Mich 55, 84-86; 718 NW2d 784 (2006) (MARKMAN, J., concurring); Petersen v Magna Corp, 484 Mich 300, 370; 773 NW2d 564 (2009) (MARKMAN, J., dissenting). Furthermore, the specific “absurd result” alleged here by the majority, that a print shop could not sell signs to a campaign because this would constitute a “contribution,” is itself absurd. A print shop is not a “public body” and, therefore, unlike a school district, is not regulated by § 57 of MCFA.
(c) The majority also errs when it concludes that MCL 408.477 of the wages and fringe benefits act provides authority for the school district to administer the payroll deduction plan. “[Sjchool districts and school officers have only such powers as the statutes expressly or impliedly grant to them.” Jacox v Van Buren Consol Sch Dist Bd of Ed, 293 Mich 126, 128; 291 NW 247 (1940). “ ‘The extent of the authority of the people’s public agents is measured by the statute from *63 which they derive their authority, not by their own acts and assumption of authority.’ ” Sittler v Mich College of Mining & Tech Bd of Control, 333 Mich 681, 687; 53 NW2d 681 (1952) (citation omitted). Contrary to the belief of the majority, the authority to administer a payroll deduction plan for a political action committee is not expressly or impliedly granted to schools in any statute.
While MCL 408.477 of the wages and fringe benefits act refers to payroll deductions, it does not authorize school districts to administer payroll deductions for political action committees. MCL 408.477(1) provides in full:
Except for those deductions required or expressly permitted by law or by a collective bargaining agreement, an employer shall not deduct from the wages of an employee, directly or indirectly, any amount including an employee contribution to a separate segregated fund established by a corporation or labor organization under section 55 of the Michigan campaign finance act, Act No. 388 of the Public Acts of 1976, being section 169.255 of the Michigan Compiled Laws, without the full, free, and written consent of the employee, obtained without intimidation or fear of discharge for refusal to permit the deduction.[14]
From this statute, the majority summarily concludes that, “under the plain language of MCL 408.477, public bodies have the authority to administer a payroll deduction plan that contributes money to the MEA-PAC if the MEA enters into a collective bargaining agreement that expressly permits the deductions.” Ante at 38 n 29. Once again, the majority has grossly misinterpreted a statute. MCL 408.477 has absolutely nothing to do with whether a “public body” may administer a payroll deduction plan for the benefit of the MEA-PAC. Rather, *64 the statute describes the approval required for an employer to deduct a portion of an employee’s wages and states that in order to deduct wages from an employee, an employer must obtain the employee’s voluntary consent. The statute also provides that such consent is not required when the wage deduction is expressly permitted by law or by a collective bargaining agreement. The most that can be discerned from this statute as it pertains to the instant case is that, if the school district is to deduct wages from its employees, it must obtain the employees’ voluntary consent unless the deduction is expressly permitted by law or a collective bargaining agreement. However, neither MCL 408.477 nor any other statute provides authority for a “public body” to administer a payroll deduction plan that contributes money to a political action committee. Therefore, even if the school district’s administration of a payroll deduction plan did not constitute a “contribution” or an “expenditure,” which it clearly does, in my judgment, the school district still lacks the authority to administer such a plan because no statute accords the school district this authority, and the school district only has the authority accorded to it by statute. Indeed, as explained earlier, the Legislature has affirmatively and expressly forbidden a school district, or any other public body, from making a “contribution or expenditure” to a political action committee.
VI. TREATMENT OF THIS CASE
Particularly striking in its resolution of this case has been the majority’s unprecedentedly dilatory treatment, followed abruptly by its unprecedentedly accelerated treatment. The Court of Appeals issued its decision on August 28, 2008; this Court entered an order scheduling oral argument on the application for leave to *65 appeal more than eight months later on May 8, 2009; oral arguments were heard six months later on November 5, 2009; and leave to appeal was granted seven months later on June 4, 2010. When leave to appeal was granted, the majority justified this on the grounds that the Court needed to be informed about the impact of Citizens United v Fed Election Comm, 558 US_; 130 S Ct 876; 175 L Ed 2d 753 (2010), a then-recent United States Supreme Court decision. Mich Ed Ass’n v Secretary of State, 486 Mich 952 (2010). The three dissenting justices in the instant case, who also dissented from the earlier grant of leave, described the complete lack of relevance of Citizens, asserting in pertinent part:
Unlike Citizens United, the issues in this case have nothing to do with corporate free speech, nothing to do with labor union free speech, nothing to do with the Federal Election Campaign Act, nothing to do with Federal Election Commission rules or regulations, and indeed nothing to do with campaign speech or the First Amendment. In short, it has nothing to do with anything involved in Citizens United. Instead, it involves only whether § 57 of the Michigan Campaign Finance Act bars a school district from administering a payroll deduction plan for á political action committee.
Indeed, neither party itself has suggested that this case is affected in any way by Citizens United, nor sought any opportunity to file a supplemental brief. Yet suddenly it is necessary that this Court delay resolution of this case for what will be a minimum of seven or eight additional months, on top of the six or seven months that have already passed since oral argument. I am aware of no previous instance in which this Court has held arguments on an application, taken no action in response to such arguments for more than six months, and then granted leave to appeal late during that term, ensuring that such case will not be further considered during that term and that a decision will not be forthcoming until, at the earliest, the beginning of the second calendar year, 2011, after arguments were initially heard. This, with *66 regard to a case that may affect the administrative processes of every school district across this state.
This Court has heen presented with substantial briefs from each party. Each party has filed an original and supplemental brief, four amicus briefs have been filed, and oral argument has taken place that lasted well beyond the normal time allotted for such argument. We have heard from the Secretary of State, the Attorney General, the Michigan AFL-CIO, the Chamber of Commerce, the Michigan State Employee’s Association, and the Mackinac Center, with a supplemental brief filed by the AFL-CIO and two supplemental briefs filed by the Chamber of Commerce. This case involves a straightforward matter of statutory interpretation, and no justice has identified to any of the parties at oral argument, or at any later juncture, any aspect of this case that has not been thoroughly addressed.
To grant leave to appeal under these circumstances constitutes an utter waste of judicial resources, imposes an altogether unnecessary expense upon the parties, and unconscionably delays resolution of an important dispute of statewide importance for no proper reason. What accounts for, and justifies, this delay? What is taking place here is an abuse of the judicial process, and the majority owes considerably more explanation for its actions than it has given. [Id. at 953 (MARKMAN, J., dissenting).]
The majority now summarily states in is opinion:
We note that because the issues presented in this case can be resolved under Michigan law, we do not opine on the application of United States Supreme Court caselaw. [Ante at 26 n 8.][15]
The absence of any conceivable relevance of Citizens United underscores our concern that the grant of leave to appeal in this case, following the argument on the appli *67 cation, represented a waste of judicial resources that imposed unnecessary expenses on the parties, while delaying resolution of an important dispute of statewide importance. Indeed, even before we heard oral arguments on the application, the United States Supreme Court specifically upheld Idaho’s absolute ban on the administration of payroll deduction plans by public bodies to facilitate employee contributions to political action committees. Ysursa v Pocatello Ed Ass’n, 555 US 353; 129 S Ct 1093; 172 L Ed 2d 770 (2009).
MCR 7.302(G)(1), which is now MCR 7.302(H)(1), was amended in 2003 to allow us discretion to order oral argument before deciding whether to grant leave to appeal. This rule created
an alternative procedure in those cases in which a majority of the Court believes that an error or an injustice will result from a lower court decision, yet in which there is not a sufficiently far-reaching or difficult legal issue to warrant using the Court’s limited resources for full oral argument. [See MCR 7.302, 469 Mich cxlvi (MARKMAN, J., concurring).]
Since the inception of this rule, we have directed the clerk of the Court to schedule arguments on whether to grant applications for leave in 280 cases. Of those cases, only 14, including the instant case, resulted in a grant of the application. Of these 14 cases, none involved a delay between argument on the application and the grant of leave approaching that involved in this case. Arguments here, which had already been delayed by more than eight months on the application, were followed by an additional seven-month delay before the application was even granted. Of the other 13 cases that followed the same double-hearing procedure, not a single one took seven months between the time of arguments on the application and the grant of leave; indeed, in a majority of those cases, the time elapsed was less than one month.
*68 After granting leave to appeal, this Court again heard oral arguments in November of this year, the period for dissenting justices to respond to the majority opinion was then compressed, and the majority has now, in December, issued an opinion in what approaches, if not exceeds, record time for the issuance of a major opinion of this Court. The majority owes the parties and the public an explanation for their treatment of a case whose resolution is so critical to maintaining the integrity of the governmental processes of our state.
VII. CONCLUSION
Section 57 prohibits a “public body” from using public resources to make a “contribution or expenditure” for political purposes. The school district’s administration of the payroll deduction plan in this case, remitting payments to the MEA-PAC, constitutes both a “contribution” and an “expenditure” as defined by MCFA. The MEA-PAC’s offer to reimburse the school district for expenses incurred in its administration of the plan does not remedy an otherwise clear violation of § 57. The majority’s contrary interpretation undermines the objectives of the Legislature, which enacted § 57 to mandate the separation of the government from politics in order to maintain governmental neutrality in elections, preserve fair democratic processes, and prevent taxpayer funds from being used to subsidize partisan political activities. The payroll deduction plan in this case is inconsistent with this legislative purpose and inconsistent with the language of the law. Accordingly, I would affirm the judgment of the Court of Appeals.
Corrigan and Young, JJ., concurred with Markman, J.

 The Secretary of State is authorized to issue declaratory rulings to implement the Michigan Campaign Finance Act, MCL 169.201 et seq., in accordance with the Administrative Procedures Act, MCL 24.201 to 24.328.

 See the discussion in part VI of this opinion.

 See also, e.g., the political activities by public employees act, MCL 15.401 et seq. (providing that an employee of the state or local unit of government may not engage in political affairs during working hours); the Michigan Gaming Control and Revenue Act, MCL 432.201 et seq. (providing that members, employees, or agents of the Michigan Gaming Control Board may not engage in political activity for the duration of their employment); and Civil Service Rule 1-12.6 (prohibiting state employees from participating in political activities during working hours).

 MCPA defines a “public body” to include “[a] county, city, township, village, intercounty, intercity, or regional governing body; a council, school district, special district, or municipal corporation; or a board, *45 department, commission, or council or an agency of a board, department, commissioner, or council.” MCL 169.211(6)(c).

5 The MEA-PAC is a “person” because, as a separate segregated fund, it functions as the result of an organization or group of persons acting jointly. See MCL 169.211(1).

 The majority states that “[w]hen a public body administers a payroll deduction plan, it does not do so in an attempt to influence a political race or a ballot question.” Ante at 37. However, the majority fails to recognize that MCL 169.204(1) defines “contribution” as “a payment... made for the purpose of influencing the nomination or election of a candidate, or for the qualification, passage, or defeat of a ballot question.” (Emphasis added.) Therefore, the pertinent question is not whether the “public body” itself is attempting to influence a political race or ballot question, but whether the payments that result from its administration of the payroll deduction plan are intended for that purpose. It is obvious here that the “payment[s] [are] made for the purpose of influencing the nomination or election of a candidate, or for the qualification, passage, or defeat of a ballot question.” This is the purpose that individual MEA members have in mind when they authorize payments, and it is the purpose that the MEA-PAC has in mind when it receives payments from the school district. It is equally obvious that the school district itself must be fully cognizant of this purpose both when it receives payments from individual MEA members and when it delivers payments to the MEA-PAC. The fact that the school district itself might not care whether such payments will influence a political race or ballot question does not alter that the purpose of these payments is to do precisely that.

 The majority further errs in its analysis when it concludes that administration of the plan “merely allows someone else to make a contribution for the purpose of influencing a political issue,” ante at 37 (emphasis in original), i.e., the MEA member who has authorized the payroll deduction. Instead, the school district itself makes both a “contribution,” and an “in-kind contribution,” by providing valuable services to the MEA-PAC in aid and furtherance of its political activities. That is, *48 quite independently of the contributions of individual MEA members, the school district contributes something of further “ascertainable monetary value” to the MEA-PAC.

 Respondent and the amici curiae supporting her devoted a significant portion of their briefs and time at oral arguments to explaining how the school district’s administration of the deduction plan amounts to an “in-kind contribution,” and yet the majority fails to even address this argument. Although the majority provides no explanation or justification for this omission, I am nonetheless sympathetic to its plight. It is just too difficult sometimes to argue that an animal that looks like a duck, walks like a duck, and squawks like a duck is not a “duck.”

 Even assuming arguendo that the school district’s administration of the payroll deduction plan constitutes “an expenditure for the establishment, administration, or solicitation of contributions to a separate segregated fund or independent committee,” which we believe it plainly does not, by its terms, the exclusion only applies to “expenditure,” and not to “contribution.”

 Moreover, the advance payment of the school district’s expenses in administering the deduction plan does not avoid the question of the extent to which an exchange of something of “ascertainable monetary value” has taken place. Where the school district has provided a service “at cost” to the MEA-PAC, even though the “ascertainable monetary value” of that service to the MEA-PAC exceeds that cost, as it almost always will in an economy in which service providers typically seek to profit from their services, further inquiry would be necessary concerning the specific terms of the school district-political action committee transaction, even if such a transaction were permissible in the first place under §57.

 If the MEA-PAC is allowed to commandeer the resources of a “public body” simply by reimbursing its costs, there is nothing that would prevent the political action committee of any corporation from demanding or receiving the same treatment.

 The MEA also argues with regard to reimbursements that since the school district is reimbursed all costs and expenses, its administration of the deduction plan does not amount to a “contribution or expenditure” because a “contribution” does not encompass “[a]n offer or tender of a contribution if expressly and unconditionally rejected, returned, or refunded in whole or in part within 30 business days after receipt,” MCL 169.204(3)(c), and an “expenditure” does not include “[a]n offer or tender *59 of an expenditure if expressly and unconditionally rejected or returned,” MCL 169.206(2)(e). However, this argument clearly lacks merit because the MEA-PAC’s offer to reimburse expenses can hardly be said to constitute a “rejection, return, or refund” of a “contribution” or an “expenditure.” When the school district collects and remits payments from MEA members to the MEA-PAC, it makes an “offer or tender” of a “contribution or expenditure.” To qualify for the “offer or tender” exception, the MEA-PAC would have to unconditionally “reject or return” the services of the school district, something which it neither does nor has any intention of doing. Because the school district’s services are unconditionally accepted by the MEA-PAC, the school district’s administration of the payroll deduction plan is not excluded from the definition of a “contribution” or an “expenditure” under either section of MCFA. Finally, the obvious should be observed, to wit, although the Legislature excluded from the definitions of “contribution” and “expenditure” “an offer or tender” of a “contribution or expenditure” that has been rejected, returned, or refunded, there is no similar exclusion for “reimbursements,” an exclusion that should be thought to have been obvious, if intended. The majority nonetheless intuits from the “reject or return” exception that “contribution” in MCL 169.204(1) “clearly requires ... a net transfer of value.” Ante at 37.

 Although I continue to abide by an “absurd results” rule — albeit a vastly different “absurd results” rule than the majority justices — the two justices who join this dissent do not. See People v McIntire, 461 Mich 147, 152-160; 599 NW2d 102 (1999); cf. Cameron v Auto Club Ins Ass’n, 476 Mich 55, 78-80, 84-86; 718 NW2d 784 (2006) (Markman, J., concurring).

14 See also MCL 169.255(6).

15 Of course, whether “the issues presented in this case can be resolved under Michigan law” is irrelevant to whether United States Supreme Court caselaw interpreting the United States Constitution applies in any-given case.